# Staunton.

### ADDISON AND ALS. V. LEWIS AND ALS.

### BLYTHE AND ALS. V. LEWIS AND ALS.

## Absent, *Moncure*, P.

1. A mortgage of the road, and of the present and subsequently acquired property of a railroad company, executed to secure the payment of its bonds, is, while it retains possession, a prior lien upon the net earnings of the road.

2. The funds in the hands of a receiver of a railroad, appointed in a suit to foreclose a mortgage executed by the company, must be applied to the satisfaction of the lien of the mortgage creditors and not to the payment of debts due to the general creditors.

3. These rules are subject to this modification, however: the net earnings, while the road is in the possession of a receiver appointed by the court, may be applied to the payment of claims having superior equities to that of the bondholders.

4. These claims are confined to outstanding debts for labor, supplies, equipments or permanent improvements of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable.

5. When a court of chancery is asked by railroad mortgagees to appoint a receiver, pending proceedings for foreclosure, the court, in the exercise of a sound discretion, may, as a condition of issuing the necessary order, impose such terms, in reference to the payment from the income, during the receivership, of outstanding debts from labor, supplies, equipments or permanent improvements of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable. If no such order is made at the time the receiver is appointed, it may be done at any time during the progress of the cause, if required in the due administration of justice and the enforcement of the equities of the respective parties.

Addison et als. and Blythe et als. v. Lewis et als.

6. When the current earnings of a railroad, which ought, in equity, to have been employed to pay *current debts* contracted before the receiver's appointment, for labor, supplies and the like, have been applied by the company to the payment of interest due mortgage creditors, to pay for additional equipments for the road, or for valuable and lasting improvements, it is competent for the court to restore what has been thus improperly diverted, and to direct such current debts to be paid out of the income in the receiver's hands, before anything derived from that source goes to the mortgage creditors.

7. This doctrine of restoration of the funds rests not upon any ground of a supposed lien of the supply or labor creditor upon the earnings of the road, but upon the idea that the officers of the company are, in a sense, trustees of these earnings for the benefit of the different claims of creditors, and if they gave to one class of creditors that which properly belonged to another, the court may, upon an adjustment of accounts, so use the income in its hands as to restore, if practicable, the parties to their original rights.

8. The claims of the general creditors can never take priority over the mortgage creditors, except when it is shown that such general creditor has, upon the principles of courts of equity, a superior equity to the lien creditor. No general rule can be laid down on the subject, but each claim must be determined upon the particular facts showing the peculiar equity.

9. The directors of a corporation are its officers or agents, and represent the interests of that abstract legal entity and of those who own the shares of its stock. One of the objects of creating a corporation by law is to enable it to make contracts, and these contracts may be made with the stockholders as well as with others.

10. When the lender of money to a corporation is a director charged along with others with the control and management of the corporation, representing in this regard the aggregated interests of all the stockholders, his obligation, when he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him; but the general doctrine with regard to this class of contracts is not that they are absolutely void, but that they are voidable at the election of the party whose interest has been so represented by the party claiming under it.

These are cases of appeal from the decree of the circuit court of the city of Richmond, rendered on the 23d day of April, 1880, in a suit in equity brought by Henry Lewis

and Henry S. McComb, who sued for themselves and all other lien creditors of the Washington and Ohio Railroad Company, a corporation of the State of Virginia, against the said corporation and others, to enforce against the defendant corporation certain claims of the complainants secured by a mortgage or deed of trust executed on the 1st day of May, 1868, by the Alexandria, Loudoun and Hampshire Railroad Company (the name of which company was, under the authority of a statute passed March 20, 1870, changed to the Washington and Ohio Railroad Company) on its road, franchises, &c.; and averring the insolvency of the corporation, the bill prayed for the appointment of a receiver, the ascertainment of the liens upon its property, and their respective priorities, and a sale of the road of the corporation, its franchises, &c., to satisfy the liens and other debts due by the corporation.

A cross bill was filed in the cause by A. E. Addison and others, claiming to be the holders of bonds issued by the Washington and Ohio Railroad Company, and secured by a deed of trust dated the 1st day of April, 1871. And petitions were filed by interveners Michael Gillen, Lewis McKenzie, James H. Read, receiver of the Farmers and Mechanics Savings Bank of Alexandria, and Adams, Hamner & Co., respectively. Appeals were allowed in said several cases, from said decree, by one of the judges of this court.

The said cases were argued at Richmond, but decided at Staunton.

The facts of the several cases, so far as it is necessary to state them in order to understand the points decided, are sufficiently stated in the opinion of *Christian*, J.

*Claughton & Stuart* in first case, and *John A. Meredith* and *R. H. Lee* in second case, for appellants.

*John A. Meredith, R. T. Barton, Wm. J. Robertson, R. H. Lee, Wise & Hobson,* and *Thos. F. Bayard* in first case, and said *Barton, Bayard,* and *Robertson* in second case, for appellees.

CHRISTIAN, J., delivered the opinion of the court.

These causes were heard together, and may all be disposed of in one opinion.

The original bill was filed by Henry Lewis, of the city of Philadelphia, and Henry S. McComb, of the State of Delaware, who sued for themselves and all other lien creditors of the Washington and Ohio Railroad Company.

The bill alleges the insolvency of the company, and sets forth with much particularity the claims of the complainants, secured by a mortgage or deed of trust executed by said company on the 1st of May, 1868, to secure the said Henry Lewis, who is the holder of bonds to the amount of $37,500, and the said Henry S. McComb, who is the holder of bonds to the amount of $150,000.

After giving a minute history of the manner in which these claims originated, and after reference to other supposed liens created by the company, and after giving in detail the condition, property, franchises and assets of the company, the bill asks for a foreclosure of their mortgage and the appointment of a receiver.

In their prayer for relief, the complainants ask:

1. "That said mortgage or deed of trust may be decreed to be a lien upon all and every part of the railroad of the said corporation and its appurtenances in the said mortgage or deed of trust mentioned, whether constructed before or since the date of the same, and upon all its property of every description, real or personal, then held or thereafter acquired, together with the said corporation's franchises, and all and singular its rights, powers and privileges in regard to said railroad and property.

2. "That it may be decreed that the entire net revenue or income of said railroad is, as the same shall accrue, subject to said mortgage or deed of trust, and that after deducting therefrom the necessary expenses of maintaining and operating said railroad ,and such charges, if any there be, which at law or in equity may have a priority over the bonds secured by said mortgage or deed of trust, any such net income may be decreed to be applied to the payment of the arrears of interest on the said bonds.

3. "That the amount due upon said bonds, principal and interest, intended to be secured by the said mortgage, the amounts due under each other mortgage executed by the corporation defendant, whether under its former or present corporate name, the sums of money due by judgment or other lien against said corporation, and the parties entitled to be paid said bonds and judgments, or other debts, be speedily ascertained and determined. And forasmuch as the parties holding, or entitled to hold said bonds, and the creditors to whom said judgments or other liens may be payable are very numerous, the complainants pray that the matter of this investigation be referred to one of the master commissioners in chancery of your honorable court, who, by proper publication, shall convene all parties interested before him, and by record or other evidence shall ascertain said matters, and return his report thereof to your honorable court.

4. "That a decree may be entered directing the defendant, the Washington and Ohio Railroad Company, to pay to the complainants what shall, upon taking such account, appear to be due to them upon the said mortgage or deed of trust, as hereinbefore mentioned, by a short day to be named by the court.

5. "That in default of such payment, it be decreed that the Washington and Ohio Railroad Company and all persons claiming under them, by any lien or incumbrance sub-

sequent to the said mortgage or deed of trust of May 1st, 1868, be absolutely barred and foreclosed of and from all right and equity of redemption in and to the said premises, and that a decree of this court be made that the defendants Henry D. Cooke and Moses Kelly, trustees under said mortgage or deed of trust, do proceed to sell the same in execution of the trusts of said deeds and pursuant to such directions as this court may make in the premises, in such manner that the purchaser or purchasers thereof shall take a title to the same, subject to such valid liens or encumbrances thereon as may be prior in legal effect to the said mortgage or deed of trust, and that the proceeds of such sale may be applied as in said said mortgage or deed of trust, is in that behalf specially directed.

"And further, that at any such sale the purchaser or purchasers of the said mortgaged premises may be permitted to pay the purchase money by the surrender of such bonds of the said company as he or they may hold according to their due order of priority and with the amount of the purchase money.

6. "That until such sale, a receiver be appointed to take charge of and administer the property conveyed by said mortgage or deed of trust, under the direction and subject to the order of this court, with the usual powers, and that until such appointment be made the president, directors and other officers of said corporation be restrained by the order of this court from further issuing any bonds of said corporation, and from in any manner transferring or disposing of any of the property or assets of said corporation, or the capital stock held by the corporation, or from using or applying the funds of the corporation to the payment of any debts of the corporation, or to any purpose other than the necessary expenses of running the railroad, until a receiver appointed by the court shall take charge of the same."

The bill was answered by the Washington and Ohio Railroad Company, and a cross-bill was filed in the cause by the appellants Addison and others, under which various accounts were ordered, numerous depositions taken, and a decree entered declaring the different liens created and outstanding against the Alexandria, Loudoun and Hampshire Railroad Company, and the Washington and Ohio Railroad Company and their priorities; and further decreeing that unless the Washington and Ohio Railroad Company, or some one for it, shall within sixty days from the date of such decree pay off and satisfy the several debts therein adjudged to be due, then certain special commissioners appointed for the purpose, after due notice in newspapers published in certain cities therein named, shall sell at public auction, at the railroad depot of the Washington and Ohio Railroad Company, in the city of Alexandria, the entire line of said railway constructed in whole or in part, and all the works and property, real, personal and mixed, and all rights, contracts and franchises of said Washington and Ohio Railroad Company as described in the several deeds of trust filed in the record.

From this decree Addison and others, and Blythe and others applied for and obtained an appeal from one of the judges of this court.

The two appeals raise substantially the same questions, and will hereafter be considered together.

Before, however, considering the interesting questions raised by these appeals, we will first dispose of the cases in which petitions were filed by interveners who came into the cause after the appointment of a receiver by the circuit court.

The first to be noticed is the petition filed by Michael Gillen. He asked to be admitted a party defendant to the suit, with leave to file an answer and cross-bill in behalf of himself and the Alexandria, Loudoun and Hampshire

Railroad Company. He claims to be holder of ten shares of stock in said company. The petition sets out many grounds of complaint against the president and directors of said company, and charges fraud and irregularity in the proceedings which resulted in the change of name of the company to that of the Washington and Ohio Railroad Company, and claims that those proceedings were null and void.

Without setting forth in detail the grounds of his petition, I think it is sufficient to say that the petition was properly rejected by the circuit court, for the reasons given by the judge of that court in his able and elaborate opinion filed with the record. After a careful examination of the authorities to which he refers, and consideration of the grounds upon which he places the rejection of the petition, I cannot do better than to adopt the views which he expresses.

" The petition must be rejected—

" 1st. The lapse of time is alone sufficient to forbid the entertainment of any contention as to the original organization of the Washington and Ohio Railroad Company. Nearly ten years have elapsed since the stockholders of the Alexandria, Loudoun and Hampshire Railroad Company, in general meeting assembled, in the city of Alexandria, July 26, 1870, adopted and assented to the provisions of an act of the general assembly of Virginia, authorizing the change of the corporate name. Since then it has been notoriously and conspicuously claiming and exercising all the corporate rights and franchises originally conferred upon the Alexandria, Loudoun and Hampshire Railroad Company, and has been recognized by the State of Virginia in all of its departments, as the successor, or *alter ego*, of the original company, and as such has contracted debts to the extent of hundreds of thousands of dollars. *Twin-Lick Oil Company* v. *Marbury*, 1 Otto, 592.

Addison et als. and Blythe et als. v. Lewis et als.

"2d. The rights of the petitioner and of all other stockholders of the old Alexandria, Loudoun and Hampshire Railroad Company, have been under the protection of the Washington and Ohio Railroad Company, as a party to the suit, represented by learned and competent counsel.

"3d. The petitioner has no real interest in this suit. The company is hopelessly and inextricably insolvent. In no possible contingency can all of its property be made to realize enough to pay its creditors, and of course no stockholder, as such, has any interest in the result of this cause.

"4th. If the petitioner had any real interest it would be grossly unjust to the other parties in interest to delay the proceedings to allow him an opportunity at this late stage of this case to litigate his rights. If the property of the company should only realize at sale the sum of $200,000, some of its creditors are suffering by delay in the mere increase of interest to the extent of $1,000 per month, the exact amount of the original par value of petitioner's stock. He holds only 10 out of 18,000 shares, and is the only complainant against all the other acquiescing shareholders, and if he were permitted to delay the proceedings it would be only equitable to require him to execute bond to indemnify the other parties against the damages consequent upon the filing of his answer and cross-bill, and it can scarcely be supposed that he would accept the privilege at the price of incurring an obligation for every thirty days of delay of the full original value of his stock."

The appeals of the other intervening petitioners, Lewis McKenzie, James H. Read, receiver, and Adams, Hamner & Co., will next be considered.

The same principles of law are applicable to each case. In each case it is sought to bring the claims of the interveners within the operations of the principles declared by the supreme court of the United States in the cases of *Fosdick* v. *Schall*, and *Hale* v. *Frost*, 9 Otto, pp. 235, 389,

and the decisions of this court in the cases of *William-son's Adm'r* v. *Washington City, Virginia Midland and Great Southern Railroad Company,* and the *Abbott Iron Company* v. *Same,* 33 Gratt. 624. I do not think that these cases can be brought within the principles of these decisions. To allow them would be to stretch the principles declared by the supreme court of the United States, and by this court, far beyond their legitimate scope. Indeed, it has been said, and said truly, that these decisions constitute "a new departure," and I am not disposed to extend the doctrine one inch beyond the point to which the authority of these cases plainly points.

The principles declared by the decisions of the supreme court of the United States were examined and approved by this court in the elaborate opinion of Judge Staples in the cases above referred to (see 33d Gratt. 624), and may be stated as follows:

1st. Mortgage of the road, and present and subsequently acquired property of a railroad company, executed to secure the payment of its bonds, are, while it retains possession, a prior lien upon the net earnings of the road. *Hale* v. *Frost,* 9 Otto, 389.

2d. The funds in the hands of a receiver of a railroad appointed in a suit to foreclose a mortgage executed by the company must be applied to the satisfaction of the lien of the mortgage creditors and not to the payment of debts due to the general creditors. *Huidekoper* v. *Locomotive Works,* 9 Otto, 258.

3d. These rules are subject to this modification, however. The net earnings, while the road is in the possession of a receiver appointed by the court, may be applied to the payment of claims having superior equities to that of the bondholders. *Hale* v. *Frost,* and *Fosdick* v. *Schall, supra.*

4th. These claims are confined to outstanding debts for labor, supplies, equipments, or permanent improvement of

the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. *Fosdick* v. *Schall, supra.*

In the last named case Chief Justice Waite says : " Railroad mortgages and the rights of railroad mortgagees are comparatively new in the history of judicial proceedings. They are peculiar in their character and affect peculiar interests." * * * * * *

When a court of chancery is asked by railroad mortgagees to appoint a receiver pending proceedings for foreclosure, the court, in the exercise of a sound discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipments, or permanent improvements of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. If no such order is made at the time the receiver is appointed, it may be done at any time during the progress of the cause, if required in the due administration of justice and the enforcement of the equities of the respective parties.

When the current earnings of a railroad, which ought, in equity, to have been employed to pay *current debts,* contracted before the receiver's appointment, for labor, supplies, and the like, have been applied by the company to the payment of interest due mortgage creditors, to pay for additional equipments for the road, or for valuable and lasting improvements, it is competent for the court to restore what has been thus improperly diverted, and to direct such current debts to be paid out of the income in the receiver's hands before anything derived from that source goes to the mortgage creditors.

This doctrine of restoration of the fund rests not upon any ground of a supposed lien of the supply or labor creditor upon the earnings of the road, but upon the idea that

the officers of the company are, in a sense, trustees of these earnings for the benefit of the different claims of creditors, and if they gave to one class of creditors that which properly belongs to another, the court may, upon an adjustment of accounts, so use the income in its hands as to restore, if practicable, the parties to their original rights.

This case, as well as the cases which followed it, further establish the proposition that the claims of the general creditor can never take priority over the mortgage creditor except when it is shown that such general creditor has, upon the principles of courts of equity, a superior equity to the lien creditor.   No general rule can be laid down on the subject, but such claim must be determined upon the particular facts showing its peculiar equity.

Now let us examine the claims of the interveners in this case and see whether, according to the principles of the decided cases, above referred to, they have established equities superior to those of the lien creditor.

The first to be noticed is that of Lewis McKenzie.   He was president of the Alexandria, Loudoun and Hampshire Railroad, and of the Washington and Ohio Railroad after the former was merged into the latter by the reorganization of the road under the act of the general assembly passed 20th day of March, 1870.   His claim is for the balance due him on account of his salary as president, which he fixes, in a statement accompanying his sworn answer, as due on 31st December, 1877, with accrued interest, at the sum of $6,527.11.   As to this claim it is sufficient to remark, that even if the claim for salary of the chief officer of the road, who had the control and disbursement of its gross earnings, can, by the utmost stretch of the decided cases, be brought within the meaning of the principle that claims *"for labor, supplies, and permanent improvements,* which enhance the value of the mortgaged property, and thereby increase the value of the security held by the mortgagees," have

priority over those of the lien creditors—I say, if such a claim, for balance due a president of the road for his salary, comes within the class of cases in which the courts have accorded superior equities to the lien creditors (to which I cannot consent), yet it is plain from the record that Mc-Kenzie has *waived* this claim to superior equity over the lien creditors, if he ever had any, by his published annual reports as president of the company from 1854 to 1877 inclusive (except the years from 1860 to 1869, which embraced the period of the war, and when the road was under the control of the United States Government), in which he puts regularly each year among the *paid* items, his salary for each year. If his salary was not in fact paid (as it seems it was not), McKenzie is only a *general creditor*, trusting to the credit of the company, and by his own official statement, published to show to the world the condition of the company of which he was president, declaring that his salary had been paid, and if not paid, making, by this official statement, the company the depositary of his claim.

All that can be said is, if his salary was not in fact paid, as he published to the world that it was, he stands in the position of a general creditor whose claim is secondary and subordinate to those of the lien creditors.

His claim is certainly not one which, under the decisions of the supreme court of the United States and of this court, is entitled to be considered as a claim of superior equity to that of the lien creditors.

I am of opinion that the circuit court was right in rejecting this claim.

The next claim to be considered is that of Reid, receiver of the Farmers and Mechanics Savings Bank.

This claim may be disposed of in a few words.

Reid claims a primary charge upon the trust fund by way of substitution for creditors of the company, on account of necessary current expenses incurred prior to the

institution of this suit.    He claims that the money lent by the Farmers and Mechanics Savings Bank was lent for the purpose of, and appropriated to the payment of these creditors.    How the money loaned by the bank was used is a mere averment of the petition, and is not established by satisfactory proof.    But if it were so established, it would not make a claim of superior equity to that of the lien creditors.

One thing is established by the proofs, which is conclusive of this claim.    The bank discounted the paper of the Washington and Ohio Railroad Company solely upon the credit of the company, and upon collaterals deposited by the company with the bank.    The acceptance of these collaterals was in itself a recognition of the subordination of the claim of the bank to the lien of the bondholders, and is sufficient to estop the bank from setting up the claim preferred in the petition.    The loan was negotiated upon the credit given to the company, secured by collaterals put up at the time of the loan.    These collaterals were bonds of the company, secured by its deed of trust double in face value of the amount of the loan.    The credit was given to the company and its bonds put up as collaterals for the loan.    It is plain, upon the facts proved, that the bank stands in the position of a general creditor; that it has no superior equity to the lien creditors, and it follows that the circuit court was right in rejecting its petition and denying the priority of its claim.

The next claim to be noticed is that of Adams, Hamner & Co.—another and the last interveners in this suit.

This claim is for the sum of $2,518.52, with interest from 3d December, 1877.    This sum of money, they aver in their petition, is " due them *as contractors* for *constructing* and building an extension or addition to said railroad to and beyond Round Hill, a point on said railroad, as it is now constructed."

Addison et als. and Blythe et als. v. Lewis et als.

This claim cannot be said to be one, under the decisions of the supreme court of the United States and of this court before referred to, which takes priority over the lien creditors. But the principles of these cases I think expressly exclude such a claim. It is a claim of contractors for the construction of the road or its extension. It in no sense comes within the category of those cases in which the courts have declared a prior equity over creditors secured by mortgage or deed of trust.

On the contrary, no case can be found, and no respectable authority can be furnished, which holds that the claim of contractors for the construction of a railroad will override that of the bondholder secured by a mortgage or deed of trust on the present and after acquired property and franchises of the road.

The well settled doctrine is, that mortgages of the road and present and subsequently acquired property of a railroad company, executed to secure the payment of its bonds, constitute a prior lien upon the net earnings of the road and upon all its property, both present and subsequently acquired.

The petitioners, Adams, Hamner & Co., whose claim is for construction of a part of the road, are but *general creditors*, having no superior equity to the lien creditors which a court of equity will prefer to the bondholders secured by deed of trust.

I am of opinion, therefore, that the circuit court did not err in rejecting the claim of the petitioners, Adams, Hamner & Co., and declaring that such claim must be subordinated to the claims of the lien creditors.

Having now disposed of all the claims of the interveners in this suit, we come now to consider the appeals of Addison and others and Blythe and others.

They may be considered together, as they involve substantially the same questions.

In both cases the right of the complainants, Lewis and McComb, to relief in a court of equity is assailed upon three grounds, and these grounds may be briefly stated as follows:

"1st. It is claimed that the contract of July, 1869, under which the advances were made and the Alexandria, Loudoun and Hampshire bonds delivered, was invalid, and so tainted with fraud as to deny any claim even to return of the money advanced.

"2d. That the associates were guilty of default by non-compliance with their covenants under that contract, and that their default occasioned damage to the company exceeding the amount of money advanced under the contract.

"3d. That the compromise of 1874 being based upon the void contract of 1869, and advancements made under it, is not binding upon the company, or upon the Washington and Ohio bondholders, because the board of directors, in assenting to it, acted *ultra vires.*"

An intelligent understanding of these positions so ably maintained in argument by the learned counsel for the appellants makes it necessarry to refer to the contract of 1869, and the circumstances under which that contract was entered into.

I cannot better state these circumstances than by adopting the language of the learned judge of the circuit court, after carefully examining the record which establishes the verity of the facts he has so well grouped together.

"The Alexandria, Loudoun and Hampshire Railroad Company was at that time in a condition of extreme financial embarrassment. It possessed what was believed to be a valuable franchise, and a completed road of some 45 miles in extent, but with a terminus which assured to it no other income than what might be realized from the mere local patronage. Eighteen hundred thousand dollars of money had been expended in the construction of this road, but its

then revenue was scarcely more than adequate to meet its actual current expenses. It was embarrassed by a comparatively small debt, but small though it was, it sufficed to retain the road in the hands of the United States government for the repayment of advances, and the period of its release and return to the control of the stockholders was then indefinite. The State of Virginia, and the people adjacent to the road, including the corporation of Leesburg, had contributed liberally, but, impoverished and exhausted by the war, they were unable to proffer any further assistance. It was, therefore, absolutely necessary to invoke the aid of outside capitalists. The means of prosecuting the road could only be expected in one of two ways—by subscriptions to the stock of the company, or by the purchase of its bonds secured by lien upon the road, franchises, &c., of the company. No reasonable hope could have been entertained of subscriptions to the stock by mere outside parties. One million eight hundred thousand dollars of stock was then in existence, and after the acquisition by the company of full title from the State to its stock, which was postponed till full payment of the purchase money— even if that stock were to be regarded as then extinguished, there would still remain some $600,000 of stock. This stock was practically valueless. The State of Virginia had just sold more than a million of it upon terms of long credit, and no security but the prospects of the company, for five dollars per share, and as that sale carried with it the power of a controling voice in the company, we may fairly estimate that element of power as the predominating consideration in estimating the agreed value. Municipalities, and counties, and citizens, and property holders along the line of the projected route might be supposed to be willing to come in upon an equal footing with these original stockholders, but certainly no outside capitalists could have been approached with any such suggestion.

"The only hope, therefore, was to raise the necessary money by a sale of the mortgage bonds of the company. To do this required competition in the great money markets of America and of Europe with a hundred other railroad enterprises, many of them with at least equal promise of security for principal and interest to the bondholder, and commended to the acceptance and confidence of purchasers by patrons and middle men of imposing influence in the financial circles. The co-operation and active agency of some such patrons and middle men was, therefore, a necessity of the occasion. This could only be accomplished in one of two ways, either by selling to them the entire issue of bonds, or by otherwise identifying their interests with the fortunes of the road.

" To accomplish this object was the purpose and intendment of the contract of July 2, 1869. There was a prior contract between the company and McComb, Chadwick and others, of date March 22, 1869, but that contract having been construed as binding the contractors to sell and account for so many of the bonds as might be necessary to complete the road to Winchester, it was by mutual consent set aside and the contract of July agreed upon and executed.

"By that contract the associates undertook to build, &c., the road to Winchester within three years, or within such longer period as might be found necessary for the successful negotiation of bonds; to make an immediate advance of money to extinguish the floating debt of the company and to make sale and account for the net proceeds of the bonds and all subscriptions of stock delivered to them at as good and fine market prices as could be obtainable therefor. Out of the proceeds of these sales the money advanced by the associates to pay off the floating debt, as above mentioned, was to be returned first, and then such sums as they should contract to pay for construction of the

road with the costs of superintendence, interest at 8 *per cent.*, &c., &c. Upon the other hand, the company contracted to make sale of no bonds except through the associates, and to deliver to them all moneys and securities received on account of subscription of stock, and from time to time as might be necessary, the mortgage bonds for negotiation and sale."

These are all the material points of the contract of 1869.

The purpose of the contract was to purchase the active agency of the associates by identifying their interests with the road, and entrusting its fortunes to their protection and control, and the only consideration to be paid by the stockholders was a participation of the associates with them in the increased value of the stock, which was to be consequent upon the success of their efforts.

The United States government has found it a not unwise policy, so far as the money value of her public lands has been affected, to make gratuities to projected railways of alternate sections of land along its pathway, reserving to herself the alone compensation in the enhanced and available purchase money of the reserved sections. And almost contemporaneously with the negotiations between the Alexandria, Loudoun & Hampshire Railroad Company and these associates, the States of Virginia and West Virginia, the city of Richmond, and other corporations and counties, and private citizens who had contributed large amounts of money to the Virginia Central and the Covington and Ohio railroads, deemed it wise and judicious to purchase the agency of capitalists in the completion of our great Central Virginia road by an absolute donation of the stock held by them in those two corporations.

These are the circumstances under which the contract of July, 1869, was entered into. The associates under that contract advanced the large sums of money they agreed to advance to pay the floating debt, &c. They are now seek-

ing to receive back out of the fund the moneys which they advanced to the company. They are met with the objection to the payment of this just demand, that the contract of July, 1869, under which they advanced their money, is *void in toto*, because two of the associates, McComb and Ames, who were parties to the contract and advanced their money, were directors of the company, and that, therefore, any contract made with them was void *ab initio*.

This position of the learned counsel is sufficiently answered by the supreme court of the United States in *Twin-Lick Oil Company* v. *Marbury*, 1 Otto, 588-9, in which precisely the same point was urged as in this case. Mr. Justice Miller, in a very able opinion, concurred in by all the justices, says, " that a director of a joint stock company occupies one of these fiduciary relations upon his dealings with the subject matter of his trust or agency, * * * is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality and which has received the clearest recognition in this court and in others. The general doctrine, however, in regard to contracts of this class *is not that they are absolutely* VOID, *but that they are voidable at the election of the party whose interest has been so represented by the party claiming under it.*"

" The directors," he continues (and this view is so applicable to the case before us that I quote further from the opinion), " are the officers or agents of the corporation, and represent the interests of that abstract legal entity, and of those who own the shares of its stock. One of the objects of creating a corporation by law is, to enable it to make contracts ; and these contracts may be made with its stockholders as well as with others. * * * * So when the lender is a director, charged, with others, with the control and management of the corporation, representing in this regard the aggregated interests of all the stockholders, his obligation, if he becomes a party to a contract with the

company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him, &c. His acts are subjected to more severe scrutiny. * * * But all this falls far short of holding that no such contract can be made which will be valid." * * * No adjudged case has gone so far as this. Such a doctrine (declaring all such contracts *void*), while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most interested in giving aid judiciously, and those qualified to judge of the necessity of that aid, and of the extent to which it may be safely given.

I think this case correctly and forcibly lays down the principles of law which govern the case before us. The action of the board of directors was not *void* because the contract was made with two of its directors, but was voidable only at the election of the "party whose interest has been so represented, by the party claiming under it."

But in the case before us, the parties interested, fully cognizant of all the provisions of the contract made with these associates, whom of course they knew to be directors, expressly ratified and approved the contract. This is abundantly shown by the record. They are now estopped from declaring the contract void.

I am further of opinion that the second objection urged against the claim of the associates—to wit: "that they were guilty of default by non-compliance with their covenants under these contracts," "and that such default occasioned damage to the company exceeding the amount of money advanced (by the associates) under the contract"—is not well taken and is not sustained by the record.

While the contract contemplated a completion of the road to Winchester within three years, it expressly provided for an indefinite extension of the time, dependent upon the

successful negotiation of the bonds. A large discretion was confided to the associates as to the time when, and price for which, the bonds were to be sold.

It would protract this opinion (already too long) to too great length, to go minutely into the evidence on this branch of the case. It is sufficient to say that the associates honestly and fairly made every effort in their power to negotiate these bonds in the money markets of the world. For this purpose they sent their agent to Europe, but the agency proved unsuccessful, without their fault, but owing rather to the stringency of the times and want of confidence generally in the money markets in railroad securities. But the company, if it ever had any claim for damages for non-compliance, on the part of the associates, with their contract of July, 1867, deliberately relinquished such claim by the compromise of 1874. The officers of the company were charged with the conduct of its business and had full authority to make such settlement as to it might seem judicious and right; and having relinquished any claim for damages, or otherwise, which they might have against those associates, by the compromise of 1874, such claim cannot now be set up by the creditors in these proceedings.

The third ground upon which the claim of the associates is assailed—to wit: " that the compromise of 1874 was *ultra vires*, because based upon the contract of 1867, which was a *void* contract"—need not be further noticed, because we have already held (*supra*) that the contract of 1869 was a valid and binding contract.

We now come to consider the only remaining question, which was preferred in argument with great earnestness and ability.

It is insisted that the bonds of the Washington and Ohio Railroad Company, which were exchanged with the associates for the Alexandria, Loudoun and Hampshire Railroad Company, had been dedicated by the charter of the

Addison et als. and Blythe et als. v. Lewis et als.

new company, and by the act of assembly, to the *construction of the road alone,* and that they could not be diverted to any other purpose, and that the appropriation of these bonds to the payment of the money advanced by the associates, was an improper diversion, and therefore *ultra vires.*

Looking to the act of assembly, Acts '69–'70, page 29, authorizing an extension of the road from Hamilton station westward, and changing the name of the company, we find it authorizes the company to borrow $15,000,000, "and to issue bonds therefor, and to sell said bonds at the best price that can be obtained for them," &c., &c. There is nothing in this act, upon its proper construction, that directs any specific appropriation of the money to be raised by a sale of these bonds. There is certainly nothing in that act that *prohibits* the company from paying off its existing debts. It would be strange, indeed, if the act should have contained any such prohibition.

In entering upon a new enterprise with enlarged franchises and for a further extension of its road, it would seem that the natural thing, and the right thing for the company to do in order to maintain its credit, and to go upon the markets of the world with any hope of borrowing money, would be first to pay off its floating debt and existing liabilities. It could obtain no credit without first providing for the payment of its floating debt. While the main object of the act creating the new charter was the extension and construction of the road, the act does not, in terms or by fair construction, make any specific appropriation of the money to be raised by the sale of the bonds.

But the resolution of the stockholders acting under the new charter created by this act, and which is incorporated in the mortgage or deed of trust, is very specific, as shown by the following resolution :

" *Resolved,* That in order to raise the funds requisite for the construction of the company's railroad from Hamilton station westward, in pursuance of the charter, and for the

stocking and equipment thereof, *and for other lawful and proper purposes connected therewith,* * * * they are hereby authorized and empowered, * * * to execute and issue the bonds, * * * and to dispose of said bonds for the *purposes aforesaid,* upon such terms as they shall deem expedient, and for the best price they can obtain."

Now, certainly it was a "lawful and proper purpose" in connection with the extension and construction of the road, that its floating debt should first be paid before the new enterprise contemplated could be prosecuted with success.

Both individuals, and corporations, and States enhance and establish their credit by the payment of their debts. And it was most essential to the new company that the floating debt of the old company should be paid before there could be any reasonable hope for the successful negotiation of the bonds of the new.

The amount due the associates from the Washington and Ohio railroad in 1874, when the compromise was effected, was the sum of $200,000, with interest from 1867. This was for money advanced " to pay off the floating debt and liabilities now (then) existing." To secure to them (the associates) the repayment of the money thus advanced, the company transferred to them the bonds of the Alexandria, Loudoun and Hampshire Railroad Company, at the rate of 150 *per cent.,* to be held as collaterals. These collaterals might have been sold by the associates, and the immediate foreclosure would have been the result. Certainly it was to the interest of the company and of the bondholders at that time to prevent this.

It was, I think, under the terms of the charter and the mortgage, " a lawful and proper purpose " to use the bonds of the Washington and Ohio Railroad Company to pay off the floating debt of the old company, and that such appropriation was not a diversion of these bonds from legitimate use, and was not *ultra vires.*

Upon the whole case, I am of opinion that there is no error in the decree of the circuit court of the city of Richmond, and that the same should be affirmed.

ANDERSON, STAPLES and BURKS, J's, concurred in the opinion of *Christian*, J.

The decree was as follows:

The court is of opinion, for reasons stated in writing and filed with the record, that there is no error in the decree of the said circuit court of the city of Richmond, rejecting the petition of the parties who intervened in the proceedings in said court, nor in rejecting the petition of the appellant M. Gillen. And the court is further of opinion that there is no error in said decree establishing the claims of the appellees and directing a sale of the road-bed, franchises, property,&c., of the Washington and Ohio Railroad Company. It is therefore decreed and ordered that the decree of the said circuit court of the city of Richmond be affirmed, subject to the modification hereinafter specified, and that the appellees recover against the several appellants in each case $30 damages, and their costs by them expended in defending the appeals and writs of *supersedeas* here. And on motion of the appellees, without objection on the part of the appellants, it is further decreed and ordered, that unless the said Washington and Ohio Railroad Company, or some one for them, shall pay the debts decreed by the said circuit court to be paid, both principal and interest, within ten days after the rising of this court, the commissioners appointed by said decree shall proceed to execute the order of sale as directed therein.

DECREE AFFIRMED.