# SUPREME COURT OF APPEALS

OF

# VIRGINIA.

## Richmond.

86   1
90  132

FIDELITY INSURANCE, TRUST AND SAFE DEPOSIT CO. ET ALS. V.
SHENANDOAH VALLEY RAILROAD CO. ET ALS.

April 11th, 1889.

1. CONSTITUTION—*Title of act—One object.*—Act of March 21, 1877, amended
   April 2, 1879, entitled, "An act to secure payment of wages and salaries
   of certain employes of railway and other transportation companies,"
   providing that employes and persons furnishing to such companies sup-
   plies, cars, and engines, is, as to the cars and engines, void, being repug-
   nant to section 15, article 5, Virginia constitution, which requires that
   "no law shall embrace more than one object, which shall be expressed
   in the title."
2. CONTRACTS—*Construction.*—In determining the real character of a contract,
   courts will always look to its purpose, rather than to the name given it
   by the parties. *Hervey* v. *Locomotive Works*, 93 U. S., 654.
3. DEBTS—*Novation—Discharge.*—It is well settled that no mere change in the
   form of the evidence of a secured debt, will discharge the debt, unless
   so intended; but that where one security is accepted in satisfaction of
   another, the debt is discharged. And this will in general be determined
   by the surrender or retention of the original security.
4. ENGINES AND CARS—*Vendor—General creditor.*—Vendor of cars and engines
   to such company, retaining title as security before a receiver has been

VOL. LXXXVI—1

appointed, is entitled to be paid by the receiver for their use, and to exhaust his lien thereon, but as to balance of his debt he is only a general creditor.

5. SUBROGATION—*Extinguishment of debts—Case at bar.*—Certain bankers held coupons of a railroad company. They furnished company money to pay wages and other. preferred debts, and received its promissory notes. To fund this indebtedness, bonds were issued,' secured on its income and guaranteed by another company, whereof the bankers took, at sixty per cent., the amount of their debt, received prior mortgage bonds as collateral, and surrendered the coupons which were cancelled, but there was no expressed agreement that their original claims were extinguished : *held,* the bankers were not subrogated to the lien of their original debt, which was extinguished by the receipt of the promissory notes.

Appeal from decree of circuit court of city of Roanoke, rendered at its April term, 1888, in the cause of the Fidelity Trust and Safe Deposit Company et als. complainants, against the Shenandoah Valley railroad company et als. defendants. The latter company was incorporated under the laws of this state, and given general powers to construct a railroad through the state, etc. Later, similar privileges were given by the states of West Virginia and Maryland. Various mortgages were executed by this company to secure divers bonds, the first named company being trustee in all. Default being made, the trustee filed this bill for a foreclosure. A receiver was appointed, and the cause referred to a master, who reported. By a former decree it was held that the bondholders under a general mortgage were entitled to share in the security of the first mortgage to the extent of $1,560,000, the amount of the first mortgage bonds deposited with the trustee as collateral security for the payment of the general mortgage bonds; and on the 24th day of December, 1887, a foreclosure was decreed, etc. Different bondholders became parties by petition pending the suit, and the first mortgage bondholders appealed. See the case of *Atwood et als.* v. *Shenandoah Valley railroad company,* 85 Va., 966. The decree here complained of, adjudged that certain "car trust creditors" had a lien on all the property of

said company for cars and engines furnished superior to that of the holders of bonds secured by mortgages. The decree also rejected the claims of certain "income bondholders" to priority over the other creditors, except as to the amount of the income bonds paid for with coupons of prior mortgages. The appellees, Clark & Kimball, bankers, complain of the decree, under the ninth rule of the court, so far as it gives to the income bondholders the benefit of the liens of the coupons used by them in purchasing income bonds as do also the first mortgage bondholders.

*William J. Robertson, John C. Bullitt, Charles L. Lamberton, Joseph Leedom, and W. W. and B. T. Crump, J. S. Clark and W. R. Staples,* for appellants.

*Johnston, Williams & Boulware, Camm Patteson, Waller R. Staples, H. Gordon McCouch, R. C. Dame and W. H. Travers,* for appellees.

LEWIS, P., delivered the opinion of the court.

We are of opinion that so much of the decree of the April term, 1888, is erroneous as decided that the claims designated in the record as the "car trust claims" constitute a lien on the franchises and all the property, real and personal, of the defendant company. These claims are for engines and other rolling stock which were furnished by the Railroad Equipment company, E. E. Denniston, and other persons to the defendant company at different times prior to the commencement of the present suit, and for which the company undertook to pay in monthly instalments; the title, however, to be retained until the equipment should be fully paid for. As appears from the master's report, the aggregate amount of these claims exceeds the sum of $700,000—a sum equal to, or, perhaps, in excess of, the real value of the equipment—and they are reported by

him, and adjudged by the court, to be liens on the property of the company prior to the mortgages in question.

This conclusion is based on certain provisions of the statute approved March 21, 1877, as amended by an act approved April 2, 1879 (Acts 1876–'77, p. 188; Acts 1878–'79, p. 352), and its correctness, therefore, depends upon the validity of those provisions.

The title of the first mentioned act is, "An act to secure the payment of wages or salaries to certain employes of railway, steamboat, and other corporations"; and the first section of the act enacts "that hereafter all conductors, brakesmen, engine-drivers, firemen, captains, stewards, pilots, clerks, depot or office agents, storekeepers, mechanics, or laborers, and all persons furnishing railroad iron, fuel, and all other supplies necessary for the operation of trains and engines, employed in the service of any railroad, canal, or other transportation company chartered under or by the laws of this state, or doing business within its limits, shall have a prior lien on the franchise, the gross earnings, and on all the real and personal property of said company which is used in operating the same for and to the extent of the wages or salaries contracted to be paid them by said company; and no mortgage, deed of trust, sale, conveyance, or hypothecation hereafter executed of said property shall defeat or take precedence over said lien."

The second section then goes on to provide how the lien secured by the first section, shall, in order to avail, be verified and recorded, and the third section provides the rights of an assignee of the lien.

The title of the amendatory act is as follows: "An act to amend and re-enact the first and second sections of an act approved March 21, 1877, entitled an act to secure the payment of the wages or salaries of certain employes of railway, canal, steamboat, and other transportation companies"; and the only amendment made by the act which is material to the present case, is that it adds the words "engines" and "cars"

to the list of supplies mentioned in the first section of the original act, and for which a lien is given.

The question upon which this branch of the case depends, is whether this legislation, so far as it relates to what is known as supply creditors, is germane to the title of the statute, or whether it is not sufficiently indicated by the title, and therefore invalid by virtue of the constitutional requirement that "no law shall embrace more than one object, which shall be expressed in its title." Constitution, article V., section 15.

The question is a grave one, and we fully appreciate its importance and delicacy. Every act of the legislature is presumed to be constitutional, and ought to be sustained by the courts, unless the conflict between the statute and the constitution be palpable; and especially is this so in a case like the present, as it is often difficult to determine the degree of particularity which must be observed in the title of a statute, in order to make the title and the body of the act conform to the constitutional requirement; but where the repugnancy between the statute and the constitution is too clear to admit of reasonable doubt, the constitution must prevail, and the statute, to the extent of the repugnancy, must be declared invalid, be the consequences what they may.

As to the constitutional provision in question, it is, as we have had occasion in a recent case to declare, not only mandatory, but of great public utility. It was introduced into the constitution for a wise purpose, and ought to be reasonably interpreted and firmly enforced. One of its objects is to prevent corrupt or surreptitious legislation by incorporating into a bill obnoxious provisions of which the title gives no indication, and its requirement is that the title, while it need not be a complete index of the act, must indicate its object with sufficient distinctness to enable the members of the legislature to fairly understand it by simply hearing the title read. In other words, the title is not to be used as a deceptive cover for vicious or surreptitious legislation.

When the title is general, as it may be, all persons interested are put upon inquiry as to anything in the body of the act which is germane to the subject expressed; but when the title is restrictive, and confined to a special feature of a particular subject, the natural inference is that other features of the same general subject are excluded.

"As the legislature," says Judge Cooley, "may make the title to an act as restrictive as they please, it is obvious that they may sometimes so frame it as to preclude many matters being included in the act which might with entire propriety have been embraced in one enactment with the matters indicated by the title, but which must now be excluded because the title has been made unnecessarily restrictive." Nor can the courts, he adds, "enlarge the scope of the title; they are vested with no dispensing power; the constitution has made the title the conclusive index to the legislative intent as to what shall have operation. It is no answer to say that the title might have been made more comprehensive, if, in fact, the legislature have not seen fit to make it so." (Cooley, Const. Lim., 149.)

In a recent case in the supreme court of Pennsylvania it is said: "The purpose of the constitutional provision is to prevent a number of different and unconnected subjects from being gathered into one act, and thus to prevent unwise or injurious legislation by a combination of interests. Another purpose was to give information to the members, or others interested, by the title of the bill, of the contemplated legislation, and thereby to prevent the passage of unknown and alien subjects which might be coiled up in the folds of the bill. The provision was found necessary to correct the evils of unwise, improvident, and corrupt legislation, and therefore is to receive an interpretation that will effectuate its true purpose. It would not do to require the title to be a complete index to the contents of the bill, for this would make legislation too difficult, and bring it into constant danger of being

declared void; but, on the other hand, the title should be so certain as not to mislead."

"We are not called upon," the court further said, "to show the necessity or vindicate the wisdom of the constitutional requirement. It is enough for us to know that it is an express mandate of the original law which the legislature ought to obey, and the courts are bound to enforce. While it may be difficult to formulate a rule by which to determine the extent to which the title of a bill must specialize its object, it may be safely assumed that the title must not only embrace the subject of proposed legislation, but also express the same so clearly and fully as to give notice of .the legislative purpose to those who may be specially interested therein. Unless it does this, it is useless." In Re Road of Phœnixville, 109 Pa. St., 44.

The constitution of Michigan contains, as do the constitutions of many other states in the Union, a provision identical with that of our own constitution above quoted, and, in the case of *People* v. *Mahaney*, 13 Mich., 481, the supreme court of that state, after referring to the practice which had theretofore prevailed of including in one act subjects of diverse natures, and saying that it was corruptive both to the legislature and the state, used this language:

"It was scarcely more so, however, than another practice also intended to be remedied by the constitutional provision, by which, through dextrous management, claims were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect. * * The framers of the constitution meant to put an end to legislation of this vicious character, which was little less than a fraud upon the public, and to require that in every case the proposed measure should stand upon its own merits, and that the legislature should be fairly notified of its design when required to pass upon it." See also *Supervisors* v. *McGruder*, 84 Va., 828;

*Lane* v. *State*, 49 N. J. Law, 673; *City of Kansas* v. *Payne*, 71 Mo., 159; *Cutlip* v. *Sheriff*, 3 W. Va., 588; *Hingle* v. *State*, 24 Ind., 28; *Ryerson* v. *Utley*, 16 Mich., 269; *Failing* v. *Commissioners*, 53 Barb., 70; *Prothro* v. *Orr*, 12 Ga., 36; *Montclair* v. *Ramsdell*, 107 U. S., 147; *Carter County* v. *Sinton*, 120 *Id.*, 517; *Ex parte Thomason*, 16 Neb., 238.

In the light of the principles, there can be no reasonable doubt, we think, that so much of the act, and the act amendatory thereof, as is relied on in the present case, is repugnant to the constitution, and therefore void. The simple and single purpose indicated by the titles to the two acts, is to secure the payment of *wages* or *salaries* to certain *employes;* and we have only to regard the plain and well understood meaning of those terms to see that by no possibility can they be made to embrace the claims in question. The price of a locomotive is not wages or salary, and a person who builds and sells locomotives, cars, etc., is, presumably, not an employe, but an employer. Bouvier defines wages to be "a compensation given to *a hired person* for his or her services"; and salary he defines as "a reward or recompense for services performed, * * the price of hiring of domestic servants and workmen," though the term is usually applied, he says, to the rewards paid to a public officer for the performance of his official duties.

We do not see how argument can make plainer the invalidity of the act in the particular mentioned. The title is misleading and deceptive. It gave not the remotest intimation of the provisions of the act relied on here, which are foreign to the subject expressed in the title, and to sustain the act in its entirety, would be, in effect, by judicial construction, to eliminate from the constitution one of its most important provisions, or, at all events, to seriously impair its usefulness. This the courts have no power to do. Our duty in such a case is to maintain the constitution inviolate, and to declare void so much of the act as is inconsistent therewith. And a decree in the present case will be entered accordingly.

It is insisted, however, that whether the statute be valid or not, the claims in question are privileged debts, entitling the claimants to superior equities to the mortgage creditors, according to the doctrine of *Fosdick* v. *Schall*, 99 U. S., 235; *Williamson* v. *W. C. V. M. and G. S. R. R. Co.*, 33 Gratt., 624, and other cases of that class.

In those cases (the principle now well established in the jurisprudence of the country) was announced, that when the current receipts of a railroad, which are always first applicable to the payment of its current debts, *i. e.* debts for labor, supplies, and the like, are used in paying the mortgage debt, or, in strengthening or protecting the security, it is competent and proper for a court of equity, when asked by the mortgagees to take possession of the road, and to hold and operate it for their benefit by the appointment of a receiver, to direct that the fund thus diverted, be restored from the income of the receivership, or, under some circumstances, even from the proceeds of the sale of the *corpus* of the other property. *Union Trust Co.* v. *Souther*, 107 U. S., 591; *Burnham* v. *Bowen*, 111 U. S., 776; *St. Louis, etc., railroad* v. *Cleveland, etc., Ry.*, 125 U. S., 658, 673; *Hale* v. *Frost*, 99 U. S., 389.

But the present case is not within this principle. Indeed, the case of *Fosdick* v. *Schall*, so far from supporting, is an authority against the position of the claimants. There certain cars had been sold by the appellee to the railroad company before the appointment of a receiver, to be paid for in instalments, and the title was retained until all the payments should be made. Default was made in the payments, and under orders in the cause, the receiver paid for the use of the cars during the receivership, but the vendor insisted that he was entitled, in addition to this, to take back the cars and also to be paid the balance due him out of any funds in court to the credit of the cause not otherwise appropriated. The supreme court held he could reclaim the cars, and that he was entitled to be paid for their use by the receiver, but that for any bal-

ance that might be due him after his own reserved security had been exhausted, he occupied the position of a general creditor only. And the present case stands upon the same footing.

Here there was, in legal effect, a conditional sale of the equipment in question, with a retention of title as a security for the purchase money. The written contracts between the parties, it is true, purport to be leases, but the mere language used is by no means conclusive of the legal nature of the transactions. As was said in *Hervey* v. *R. I. Locomotive Works*, 93 U. S., 664, (which also was a case of a rolling stock contract) "the transaction is not changed by giving it the form of a lease. In determining the real character of a contract, courts will always look to its purpose, rather than to the name given it by the parties."

The claimants, moreover, have been paid by the receiver, with the sanction of the court, for the use of the equipment *by him*, and this was proper, as it is the duty of a court to pay from the trust fund in its possession all the debts it incurs in administering the trust. *Myer* v. *Car Co.*, 102 U. S., 1. They are also entitled to enforce what is, in effect, a lien retained by them upon the equipment for whatever may now be due them; that is to say, they are entitled to reclaim it; nor is this disputed. But as for any balance that may remain after enforcing that lien, they are, as the supreme court said in *Fosdick* v. *Schall*, general creditors only, with no special equities in their favor.

To the same effect is *Huidekoper* v. *Locomotive Works*, 99 U. S., 258, which was the case of a conditional sale of locomotives, and in which the same principle was applied. In *Burnham* v. *Bowen*, 111 U. S., 776, a claim for coal furnished the railroad company, to be used on its engines, before the appointment of a receiver, was allowed on the ground that the income of the receivership had been used to pay off incumbrances on the mortgaged property, thereby increasing the

security of the bondholders at the expense of the labor and supply creditors.    It was held that this was such a diversion of what was denominated the "current debt fund" as to make it proper to require the mortgagees to pay it back.    The court, however, added, by way of caution, as in *Union Trust Co.* v. *Morrison,* 125 U. S., 591, it afterwards repeated: " We do not now hold, any more than we did in *Fosdick* v. *Schall,* or *Huide-koper* v. *Locomotive Works,* that the income of a railroad in the hands of a receiver, for the benefit of mortgage creditors who have a lien upon it under their mortgage, can be taken away from them and used to pay the general creditors of the road. All we then decided, and all we now decide, is, that if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use."

The same principle was recognized in *Addison* v. *Lewis,* 75 Va., 701, in which case, after referring to *Fosdick* v. *Schall,* and similar cases, Judge Christian, in whose opinion all the judges present concurred, said: "It has been said, and said truly, that these decisions constitute 'a new departure,' and I am not disposed to extend the doctrine one inch beyond the point to which the authority of these cases plainly points."

Many other cases were referred to in the argument, which we have examined, but it is unnecessary to comment upon them.    The truth is, no invariable rule is deducible from the authorities.    Each case must, therefore, be decided in the light of its own circumstances; and so viewing the present case, we think the claims in question are not such debts as ought, in equity and good conscience, to be accorded priority over the mortgage creditors.    It was not alleged in the petitions of intervention filed by the claimants in the court below, nor is it proven, that any portion of the current income of the company before the appointment of the receiver was diverted to the benefit of the bondholders; and where there has been " no diversion, there can be no restoration."

This, then, disposes of the car trust claims.

We come next to consider the case of Messrs. Clark & Kimball, bankers of Philadelphia, who have also appealed from so much of the decree as postpones to the first and second mortgages their claim to priority over those mortgages to the extent of the promissory notes of the Shenandoah Valley railroad company used by them in purchasing income mortgage bonds of the company, and now held by them. On the other hand, the appellees complain of the decree, under the ninth rule of the court, on the ground that the decree goes too far in favor of the said appellants in giving them the benefit of the liens of *the coupons* which were used by them in purchasing income bonds, and who insist that this alleged error should be corrected. The ground of this contention is, that the coupons, when surrendered to the company, were paid for and discharged with income bonds, and consequently the liens to secure them were to that extent extinguished also.

A brief reference to the facts is essential to a correct understanding of the questions thus raised.

The appellants, Clark & Kimball, were for a long while the bankers of the railroad company, and appear to have rendered it valuable pecuniary aid. Their unpaid loans to the company at one time amounted to nearly a half million dollars, which were evidenced by the promissory notes of the company. Much of the money thus loaned, it is claimed, went to pay off labor and supply claims and other privileged debts of the company. They also held a large amount of the first and general mortgage coupons of the company, maturing in 1883 and 1884. These, with the notes above mentioned, were used at par in purchasing income bonds at sixty cents on the dollar, which bonds are secured by what is called the income or third mortgage on the road.

The appellant's claim is founded upon two propositions, namely, (1) that as to the coupons, there was a mere exchange of securities, without affecting *the debt* of which the coupons

were the evidence; and (2) that as to the promissory notes, the money for which they were given was used in the payment of preferred debts, and, therefore, that the appellants are entitled to be subrogated to the rights and privileges of the creditors whose debts were thus paid.

There is certainly no better settled principle in equity, nor one, perhaps, which has oftener been recognized and acted upon by this court, than that no mere change in the form of the evidence of a debt secured by mortgage, deed of trust, or a vendor's lien, will operate to discharge the debt, unless so intended by the parties. The cases of *Yancey* v. *Mauch*, 15 Gratt., 300; *Gibert* v. *W. C. V. M. and G. S. R. R. Co.*, 33 *Id.*, 586, and *Stimpson* v. *Bishop*, 82 Va., 190, may be mentioned among the many cases in this court on that subject. At the same time, it is equally well settled that where one security is accepted by the creditor in satisfaction of another, the debt evidenced by the latter is discharged. In a case, therefore, of a change of securities, the question always is, what was the intention of the parties? or, as it is usually expressed, the question whether the transaction amounts to a novation is a question of intention, to be derived from all the circumstances of the case, although nothing positive be expressed. And in the absence of proof of a special agreement, the giving up or the retention of the original security will, in general, be a decisive circumstance in determining that question; for if the creditor means, in any contingency, to resort to the original indebtedness, he will scarcely be willing to surrender all evidence of that indebtedness to his debtor without fortifying himself with some acknowledgment of the real nature of the transaction. This was decided in *Morris* v. *Harveys & Williams*, 75 Va., 726, and such is the well settled doctrine.

In the present case there was no express agreement when the coupons in question were surrendered, and hence we must look to the surrounding circumstances to ascertain what the intention of the parties was.

It appears from the record that income bonds to the amount of $1,500,000 were issued and sold by the railroad company, which were principally paid for with the coupons and notes above mentioned. These bonds were secured, as already stated, by what is called the income or third mortgage, which mortgage was executed in accordance with a previous written agreement between the Shenandoah Valley railroad company and the Norfolk and Western railroad company, bearing date December 29th, 1882.

That agreement shows that, by a previous contract between the same parties, dated September 27th, 1881, the Shenandoah Valley company had agreed to complete its road, the southern terminus of which was then at Waynesboro, to a junction with the Norfolk and Western road, which, up to the 29th of December, 1882, it had failed to do. Accordingly, it was agreed that, in order "*to pay and provide for its floating and accruing indebtedness,*" and to raise the means to complete its road, the Shenandoah Valley company would issue income bonds, and secure them by an additional mortgage. And "*for the purpose of adding to the value of said income bonds, and more promptly and advantageously negotiating the same,*" the Norfolk and Western company agreed *to guarantee,* on certain specified conditions, the payment of interest on the bonds, which, it was agreed, should not be sold at less than sixty per cent. of their par value, payable in cash or obligations of the first mentioned company, including mortgage coupons maturing in 1883 and 1884.

The mortgage was accordingly executed on the 12th of February, 1883, and it set forth the object of the issue of the bonds secured by it, the terms and conditions upon which they were issued, and also the substance of the agreement aforesaid, as did the bonds themselves.

The appellants, Clark & Kimball, thus had, independently of their official connection with the company, full notice of the objects for which the bonds purchased and now held by

them were issued, and it is not reasonable to suppose that, in surrendering their coupons at par and getting for them at sixty cents in the dollar income bonds secured and guaranteed as already indicated, they were merely exchanging one form of indebtedness for another, leaving the original indebtedness evidenced by the coupons, unaffected. On the contrary, the circumstances of the transaction preclude any such conclusion. Here not only was the original security given up, but a new one was taken, secured not only on the property of the debtor, but guaranteed, to a certain extent, by a third and solvent party, and the new security reciting, what was known before, that it was issued to pay the floating and accruing indebtedness of the company, a large portion of which indebtedness was used at par in purchasing the bonds at only a little over one-half of their nominal value.

In addition to this, the coupons, when turned into the company, were cancelled, and the transaction was treated, as in effect it was, an extinguishment of the coupons. And that such was the intention of the parties at the time, hardly admits of doubt.

Besides, if this be not the true view of the matter, the appellants must, upon the plainest principles of equity, be held to have waived the claim now asserted by them. In a printed statement to the New York Stock Exchange, dated May 31, 1883, accompanying their application to have the mortgage bonds of the company, including the income bonds, "listed," as it is called, statements were made by the officers of the company as to the financial condition of the company which are utterly at war with the claims now asserted; that is to say, according to that statement, no such claims as those now asserted, were outstanding or chargeable against the company; and if they are good now, they were good then, and ought to have been embraced in the statement. At that time Kimball, one of the appellants, was the president of the company, and Clark, the other appellant, was one of its directors.

Upon the strength of these representations, sales of the bonds were no doubt effected to innocent purchasers, and it would now be the grossest injustice to such persons to allow the claims in question as a preferred charge on the mortgaged property, and thereby, to that extent, to impair the security of the mortgages. Plainly upon no just principle can this be done.

A decisive authority upon this point is *Addison* v. *Lewis*, 75 Va., 701. There the president of the railroad company intervened and asserted a claim for several years' salary which accrued before the road went into the hands of a receiver, but as it appeared that in his published annual reports, as president for the years in question, his salary for those years was put among *the paid items*, it was held that any right which he might have had to be paid in preference to the bondholders had been waived, although the salary in point of fact had not been paid. This ruling, it seems to us, is eminently just and proper, and in accordance with public policy, inasmuch as the officers of a railroad company are, in a general sense, trustees, and must therefore act in the strictest good faith in putting forth statements to the public as to the condition of the affairs of the company, upon which innocent third persons, in their dealings with the company, have a right to rely.

The same considerations apply to the promissory notes in question, and as to which the appellants claim the right of subrogation. But enough has been already said to show that this is not a proper case for the application of that doctrine.

"The law of subrogation is the exercise of the equitable powers of the court, to afford a summary relief to *a meritorious* creditor, who might otherwise be subject to loss by the operation of proceedings at law against the estate or funds of one who is indebted both to him and to others. This equitable remedy is allowed only when it does not conflict with the legal or equitable rights of other creditors of the common debtor." "It is the creature of equity, and justice is its object. It is

founded, not upon contract, express or implied, but upon principles of equity and benevolence, and is only to be administered in a clear case, and never to the prejudice of the rights of others." "Being purely a creature of equity, it is only enforced in those cases where its application is just, and sanctioned by the obligations of good faith and sound policy." Sheld. Subra., section 4; *Enders* v. *Boone*, 4 Rand., 438; *Clevinger* v. *Miller*, 27 Gratt., 740; *Miller* v. *Holland*, 84 Va., 652; 3 Pom. Eq., section 1419, note 1.

Besides, there is no proof that when the money was loaned for which the notes were given, there was any understanding as to how it should be applied. The company at the time was financially embarrassed, and the loans were simply made in the ordinary course of business. The lenders were pecuniarily interested in the road, and no doubt were influenced thereby in loaning the money, but with no agreement that any particular claims, or class of claims, should be paid with it. Indeed, Kimball himself, one of the appellants, testifies explicitly in his deposition that the money was advanced without any special agreement, written or verbal; so that it went into the treasury of the company unaffected by any special equities of the appellants; and when afterwards a part of it was paid out to laborers and supply men, the debts so paid were forever discharged.

It appears, moreover, that when the notes for the loans were taken, the appellants received general mortgage bonds of the company as collateral security for their payment, which goes far to show, if it does not conclusively show, that the idea of a right to subrogation is altogether an afterthought. For why take general or second mortgage bonds as collateral if the understanding was that the appellants were to stand in the place of those whose equities were superior even to the first mortgage? To this question the answer must be; that the money was loaned on the credit of the company and the col-

laterals so furnished, alone.   At all events, such is the fair inference from the record, and there is no evidence to repel it.

In *Addison* v. *Lewis, supra,* a similar claim was asserted on the part of a bank for money advanced by it before the appointment of a receiver, and which was used by the railroad company in paying current expenses.   The claim, however, was rejected.   The court said: " The bank discounted the paper of the company solely upon the credit of the company and upon collaterals deposited by the company with the bank.   The acceptance of these collaterals was in itself a recognition of the subordination of the claim of the bank to the lien of the bondholders, and is sufficient to estop the bank from setting up the claim preferred in the petition."

The cases of *Coe* v. *N. J. Midland railway company,* 31 N. J. Eq., 105, and *Atkins* v. *Petersburg railroad company,* 3 Hughes, 307, relied on by the appellants, are not in point, as in each of those cases the advances were made, at the instance of the debtor, on a distinct understanding, clearly established, that the parties by whom they were made, should be subrogated to the rights of the creditors whose debts were paid with the money advanced.   See 3 Pom. Eq., section 1212, and cases in the notes.

In short, we are of opinion that the claim of the appellants, Messrs. Clark & Kimball, to superior equities to the bondholders cannot be sustained; that they are entitled, as to the income bonds held by them, to the security of the income mortgage only, and that so much of the decree of the circuit court as is in conflict with this opinion must be reversed and annulled.

DECREE REVERSED IN PART AND AFFIRMED IN PART.