## Staunton.

Morriss et al. v. Harveys & Williams.

Absent, *Moncure*, P.

1. The note of a debtor does not operate as a payment of an antecedent debt unless so intended by the parties. In the absence of such intention, express or implied, the note is treated as a conditional payment merely.

2. If such antecedent debt has passed into a judgment, the same rule applies; the new note is considered simply as a conditional satisfaction of the judgment, and upon the dishonor of the former, the latter revives and may be enforced at law or in equity.

3. When the parties provide for the extinguishment of the judgment, it may be fairly presumed that they contemplated the extinguishment of the debt upon which it is founded. If the substituted note is accepted in satisfaction of the judgment, the presumption is, in the absence of proof to the contrary, that it was accepted in satisfaction of the debt represented by the judgment.

4. While it is true that neither the judgment nor the substitution of other securities will prevent a court of equity, when a deed is sought to be impeached, as voluntary, from looking to the original cause of action in order to ascertain whether it was a subsisting debt contracted at the time the deed was made, yet where the rights of third persons have intervened, as in the case of a settlement upon wife and children, it is certainly competent for them to show, if they can, that not only the judgment, but the debt upon which it is founded has been satisfied and discharged by the substitution of a new security.

5. It is not essential that any particular form of words be used as "full satisfaction" or "absolute payment," but any language will be sufficient which, with the surrounding circumstances, plainly indicates a satisfaction of the debt by the adoption and acceptance of a new and different security.

6. Where the transaction amounts to a novation of the debt by a mere exchange of securities, the new contract is accepted in satisfaction of the old—becomes an accord executed, and discharges the original cause of action, whether the new contract is ever performed or not.

This is an appeal from a decree of the chancery court of the city of Richmond. It was heard at Richmond, but decided at Staunton. The facts necessary for a proper understanding of the case, so far as they are not stated in the opinion of *Staples*, J., are these:

In December, 1871, Abner F. Harvey and John H. Williams, surviving partners of the firm of Harveys & Williams, filed their bill in the circuit court of the city of Richmond, in which they alleged that on the 15th of March, 1869, Charles Y. Morriss conveyed to P. H. Aylett, as trustee, a tract of land, lying in the county of Buckingham, known as "Montevideo," for the separate use of his wife, Pauline, during her natural life, whether covert or sole, for the support and maintenance of herself and children, etc. It was further provided in said deed that so soon as any son of C. Y. Morriss and his said wife should attain the age of twenty-one years the estate of said trustee should cease and the legal title of the trust estate should be vested in such son with all the rights and duties of the former trustee. P. H. Aylett was dead, and Richard G. Morriss, a son of C. Y. and Pauline Morriss, having attained the age of twenty-one years, had succeeded to the trusteeship aforesaid.

Before the execution of said trust deed, C. Y. Morriss owed Merrick & Sons, of Philadelphia, a considerable sum of money; and afterwards, at the request of said Morriss, the plaintiffs consented to endorse notes to the amount of the debt, Merrick & Sons having consented to extend and renew the debt, and the notes were delivered to them. Subsequently, Morriss, being unable to meet his engagements, suspended, leaving unpaid the whole of said debt, amounting to $15,852.12; and it was claimed that the trust property was liable for this debt on the ground that it existed prior to the execution of the deed, which was voluntary. In this state of things the plaintiffs purchased from Merrick & Sons

their debt of $15,852.12 for $6,340.85. It was further alleged that said C. Y. Morriss and wife, recognizing the liability of the said trust property, and having previously agreed to indemnify the plaintiffs in their said purchase, made and delivered to them a writing which provided that, in case the property surrendered by said C. Y. Morriss on the 10th of June, 1870, to Harveys & Williams for the benefit of his creditors, should be insufficient to reimburse them for their outlay in purchasing said debt, the Buckingham property might be held liable therefor. It was alleged that the property so surrendered had proved insufficient to indemnify the plaintiffs; that there was still a balance of $7,806.40 due them after exhausting all the assets, and they claimed that they had thus become entitled to a decree subjecting the Buckingham estate to the payment of said $6,340.85. Charles Y. Morriss answered the bill, claiming that at the time the deed complained of was executed he was possessed of an estate far beyond what was necessary to pay his debts; that the settlement was reasonable and proper, and was made in consideration of the wife's having relinquished her dower in a very large amount of his real estate by a deed made but a few days before, conveying to Aylett and Carrington about $100,000 worth of realty for certain purposes therein specified; that plaintiffs did not become bound as endorsers on the notes until March 1st, 1870, nearly twelve months after the deed of settlement was executed, and with full knowledge of its existence, and so they were estopped from denying its validity, except so far as they could claim under their agreement of January, 1870; it was insisted, however, that agreement was *nudum pactum*, being made the day after the execution of the deed to Harveys & Williams, by which provision was made for the payment to Merrick & Sons of the said sum of $6,340.85, which sum had actually been paid off to them by the respondent; that he (respondent) effected a compromise with his creditors

by which they were to receive less than thirty per cent. of their debts, and to accept notes of Harveys & Williams at three and six months for the amount, and it was claimed that when those notes were accepted, respondent was discharged; as all the creditors had not assented to the arrangement, it was further agreed that Harveys & Williams might use a sum not exceeding $6,000 to effect the arrangement and pay off, on the best terms, such creditors as would not accede to the arrangement. To carry out this plan and secure Harveys & Williams on the said note, respondent executed the deed of June 10, 1870, by which he conveyed all his estate to Harveys & Williams to secure the payment of said notes. They thus became both trustees and creditors. After the payment of all the notes given for the debts specified in schedule A, it was stipulated that thirty *per centum* should be paid on the debt in schedule B, being the debt to Merrick & Sons. For this debt Harveys & Williams never executed their notes, because the said debt had been compromised with said Merrick & Sons before the execution of said deed, by the payment of the sum of $6,340.85 to said Merrick & Sons, which payment was made with the money advanced by respondent for that purpose and so applied.

After certain proceedings had, Richard G. Morriss filed his answer, wherein it was alleged, among other things, that in the year 1861, Merrick & Sons held two notes of C. Y. Morriss for $6,122.06 each, one due June 1, 1861, and the other June 8, 1861, which were not paid in consequence of pending hostilities. In 1869 Merrick & Sons obtained a judgment in the United States circuit court for the amount of both of said notes. Afterwards, on June 5, 1869, C. Y. Morriss paid and satisfied said judgment by delivering to James Alfred Jones, Esq., a check for $1,029.65 and six negotiable notes, all dated June 1, 1869, made by C. Y. Morriss and endorsed by Harveys & Williams, payable at four,

eight, twelve, sixteen, twenty and twenty-four months after
date, and the said check and notes were received and ac-
cepted by Merrick & Sons in satisfaction of said judgment.
This answer contained other statements which are referred
to in the following opinion. After further proceedings, the
court, on the 11th of December, 1877, decreed, among other
things, that the "Montevideo" property was liable to the
debt of Harveys & Williams, which was then held by the
National Bank of Virginia, and directed that said property
be sold if said debts were not paid within ninety days.
From this decree and that of February 19, 1876, an appeal
was obtained from one of the judges of this court.

*John A. Meredith* and *John Lyon*, for appellant.

*Jones & Bouldin* and *John A. Coke*, for the appellees.

STAPLES, J. The learned judge of the chancery court was
of the opinion that the judgment recovered by Merrick &
Sons against Charles Y. Morriss was fully satisfied and dis-
charged by the settlement of June 5th, 1869; but that the
debt for which the judgment was rendered was not extin-
guished, but still remained, and having been contracted
prior to the conveyance of the "Montevideo" estate to
Mrs. Morriss and her children, might be enforced against
that estate.

With great respect to the opinions of the chancellor, I
cannot concur in this view. It seems to me that if the
judgment is to be regarded as satisfied, the debt must be
considered as also satisfied. As will be hereafter seen, the
general rule applying in all this class of cases, is that the
debtor's own note does not operate as a payment of an ante-
cedent debt, unless intended by the parties. In the absence
of such intention, expressed or implied, the note is treated
as a conditional payment merely, that is, when actually

paid. If the debt has passed into a judgment, the same rule applies; the new note is considered simply as a conditional satisfaction of the judgment, and upon the dishonor of the former, the latter revives and may be enforced at law or in equity. On the other hand, when the parties provide for the extinguishment of the judgment, it may be fairly presumed they contemplate the extinguishment of the debt upon which it is founded. If the substituted note is accepted in satisfaction of the judgment, the presumption is, in the absence of proof to the contrary, it was accepted in satisfaction of the debt represented by the judgment. By the judgment, the nature of the cause of action is changed, and the debt loses all its vitality and ceases to bind the parties. Its force and effect are then expended, and all remaining legal liability is transferred to the judgment. *Wagmar* v. *Cochrane*, 35 Ill. 154.

When once we reach the conclusion that the notes of Charles Y. Morriss, endorsed by Harveys & Williams, were received as a conditional payment, they necessarily so operated with respect to the judgment, and whatever might be the effect at law, the lien would still remain to be enforced in a court of equity. On the other hand, if the nature of that transaction be such as to satisfy the mind that the notes were accepted in absolute payment of the judgment, or as a substitute therefor, it is to be presumed that the debt represented by the judgment was included in the arrangement and was intended to be also discharged and satisfied.

The learned judge of the chancery court has declared that neither the judgment nor the substitution of other securities will prevent a court of equity, where a deed is sought to be impeached as voluntary, from looking to the original cause of action in order to ascertain whether it was a subsisting debt contracted at the time the deed was made. The correctness of that proposition will not be contro-

verted; but where the rights of third persons have intervened, as in the case of a settlement upon a wife and children, it is certainly competent for them to show that not only the judgment, but the debt upon which it is founded, has been satisfied and discharged by the substitution of a new security. It will be conceded that if the creditor expressly agrees to accept the new security in absolute payment of this debt, he cannot afterwards revive it for the purpose of impeaching and invalidating the settlement. If the party accepts the thing, though but for a moment, for that for which the other party pays, he cannot afterwards, by his subsequent dissatisfaction, get rid of the effect of it. *Hardman* v. *Bellhouse*, 9 Mees. & Wels. 596. As already stated, the agreement need not be express, but may be implied. It is not essential that any particular form of words shall be used, as "full satisfaction," or "absolute payment," but any language will be sufficient, which, with the surrounding circumstances, plainly indicates a satisfaction of the debt by the adoption and acceptance of a new and different security.

Sometimes the transaction amounts to a novation of the debt by a mere exchange of securities. In such case, the new contract is accepted in satisfaction of the old—becomes an accord executed, and discharges the original cause of action, whether the new contract is ever performed or not. Here, again, it is a question of intention, to be derived from all the circumstances, although nothing positive be expressed. 2 Smith's Lead. Cases, 268.

The real difficulty in all this class of cases is in ascertaining what is the real intention of the parties. Sometimes, where they have used words of plain import, the courts differ as to the true meaning and effect of the words so used. The circumstance often relied upon, as affording strong presumptive proof of the intention, is the surrender of the original securities to the debtor. The doctrine on

Morriss et al. v. Harveys & Williams.

this subject is thus laid down in 2 American Lead. Cases, 271: "When the securities held by the creditor are *surrendered*, or the note is taken as one of several items making up a large sum, and a receipt or credit is given for the whole, the inference will be strong, if not irresistible, that the debt is satisfied."

In a case decided by the supreme court of Pennsylvania, cited in 5th Rob. Prac. 863, Rogers, J., in discussing a similar question, said: "Whether taking the separate note of one of the parties amounts to an extinguishment or satisfaction of a joint debt depends upon the intention of the parties, and, in the absence of all proof of a special agreement, the giving up or the retention of the original security will, in general, be a decisive circumstance, for it is difficult to account for the fact except on the supposition that in the one case it was intended in case of need, to enforce the joint liability, or, in the other, to depend altogether upon the responsibility *of one* of the joint debtors. Where a joint debtor insists that the separate note is substituted and is in satisfaction of the joint debt, the *onus* is upon him, and to discharge himself from liability, it will be necessary to show a special contract to that effect, or that, in addition to a separate note being taken for the amount of the debt, the original bills were given up to the debtor." The same reasoning will apply where there is but a single debtor, for if the creditor means, in any contingency, to resort to the original indebtedness, he will scarcely be willing to surrender all evidence of that indebtedness to his debtor without fortifying himself with some acknowledgment of the real nature of the transaction.

I am free to admit that generally the courts are reluctant to treat the new note as a satisfaction where the effect will be to deprive the creditor of a subsisting lien. But where, as in this case, there is a judgment, and the parties, by unmistakable acts and declarations, show that they con-

sider the judgment satisfied and extinguished, there is less difficulty in treating the debt represented by the judgment as also satisfied. See 2 Daniel on Negotiable Ins., p. 260–1 ; see 1 Smith's Lead. Cases, notes to *Cumber* v. *Wane,* p. 150 ; 2 Parsons on Bills and Notes, p. 157, and notes ; *Blair & Hoge,* v. *Wilson,* 28 Gratt. 165, upon the question here discussed.

Bearing these principles in mind, let us look to the settlement of June 5th, 1869, which has already been referred to. The writing evidencing this settlement is in the following words :

"*In satisfaction of a judgment* of the circuit court of the United States for the district of Virginia, rendered in favor of Merrick & Sons, of Philadelphia, against Charles Y. Morriss, of Richmond, on two negotiable notes executed by C. Y. Morriss to Merrick & Son, each for $6,122$\frac{0.6}{100}$, payable June 1st, 1861—the other June 8th, 1861—I, James Alfred Jones, attorney for Merrick & Sons, have this day *received and accepted* one thousand and twenty-nine dollars and ninety-five cents, in cash, and six negotiable notes of Charles Y. Morriss, endorsed by Harveys & Williams, for the aggregate amount of eighteen thousand two hundred and ninety-seven dollars ; the said several notes being — and payable at the dates described in the above memorandum. The said original notes of $6,122$\frac{0.6}{100}$, payable respectively on June 1st, 1861, and June 8th, 1861, are to be delivered to Mr. Charles Y. Morris as soon as they can be gotten from Philadelphia.

" JAMES ALFRED JONES,
"*June 5th,* 1869."          " Att'y for Merrick & Sons."

Before considering the terms and meaning of this instrument, it is important to inquire what were the surroundings and circumstances of the parties at the time it was executed. At that time Charles Y. Morriss was free from

debt with the exception of the amount due Merrick & Son. He had paid all the notes upon which Harveys & Williams were bound as endorsers. He was possessed of a large and valuable estate, real and personal, more than ten times the amount of the debt in question; he was engaged in a very extensive business, from which Harveys & Williams derived very considerable profits. They, Harveys & Williams, were merchants in good standing, of unquestioned credit in the commercial world, and possessed of means amply sufficient to pay the debt due Merrick & Sons without embarrassment or difficulty. Merrick & Sons, then, in accepting the negotiable notes in question, were, according to all human calculation, provided with a security as safe and unexceptionable as that furnished by the lien of the judgment, with the further advantage of a prompt payment at the maturity of each of the notes. The primary object of Morriss, no doubt, was an extension of time and the payment of the debt by instalments, easily to be met and discharged. It is very probable that the existence of the judgment was considered as in some measure affecting the commercial credit of Charles Y. Morriss, in the preservation of which Harveys & Williams were greatly interested, and, therefore, it was the extinction of the lien that may have been considered a matter of importance to the parties. But these were by no means the only objects in view. Charles Y. Morriss had on the 15th of March, 1869, but a few days after the lien of the judgment attached, conveyed the "Montevideo" estate in trust for the benefit of his wife and children. In that deed it is declared that the grantor is desirous to secure a provision for the support of his said wife and children, present and future, against any adverse fortune which may befall him, and now, while his means are ample and he can make such provision without leaving him less than an estate exceeding by much all that he owes, &c. The debt due Merrick & Sons was the only one that antedated

the conveyance to the wife and children, and this judgment constituted the only lien upon the estate. That lien being extinguished and out of the way, the provision for the wife and children was beyond the reach of every disaster or misfortune which might befall the grantor. There is no doubt of the entire good faith of this transaction, and there is little doubt that Harveys & Williams were perfectly safe in endorsing for Morriss, for they were so situated with respect to his affairs as to have in their own hands the means of indemnity against every liability. Such was the condition of things when the agreement of the 15th of June, 1869, was executed. It purports on its face "to be a settlement of the debt due Merrick & Sons." A liquidation and adjustment of the debt—not the judgment. The language in this respect is striking and significant, and it will be observed that this settlement is based, not upon the judgment, but upon the original notes, which it seems were then in the possession of Merrick & Sons. Their aggregate amount, principal and interest, is accurately ascertained; a cash payment of $1,074.15 is stipulated to be made, and the residue of $17,000 is to be divided into six instalments, for which negotiable notes were to be given of $2,850 each, all of which were to be endorsed by Harveys & Williams. Thus endorsed, they were "received" and "accepted" in satisfaction of the judgment. It is further provided that the original notes were to be delivered to Charles Y. Morriss as soon as they can be gotten from Philadelphia. This plainly indicates a purpose to abandon the original liability and to rely upon the new security exclusively for payment. If such was not the purpose, why was it not so declared in explicit terms? The learned counsel who prepared the paper is justly eminent in his profession; if he, looking to the future, anticipated the probable or possible contingency of a resort to the original security, why did he not so provide? Why did he agree

to the surrender of the original notes; or why did he not guard against every inference to be drawn from such surrender, by declaring that the new notes were accepted as conditional payments merely? If, indeed, as is now claimed, a distinction is to be made between the judgment and the debt; that whilst the former was discharged, the latter was intended not to be, is it credible that counsel would have agreed to deliver to the debtor the evidence of the debt without providing that such delivery should not affect the original liability, in the event of the nonpayment of the substituted notes? Mr. Jones, no doubt, prepared the paper as he was instructed to prepare it. He was no doubt told that Merrick & Sons considered the notes of Charles Y. Morriss, endorsed by Harveys & Williams, as the very best security for their debt; that they were willing to accept these notes and to rely upon them for payment, and that they were also willing to gratify Charles Y. Morriss by surrendering the original notes, and to enter of record that the judgment was satisfied. If this be not the true interpretation of the meaning and conduct of the parties and counsel, why was not Mr. Jones examined to show what was the real understanding and agreement? His testimony would go very far to explain the transaction and to remove the difficulties in the way of the appellees, in sustaining their present pretension.

It is still more difficult to understand why Merrick & Sons were not brought forward as witnesses. What was their understanding of the matter? Did they believe that the notes of Charles Y. Morriss were accepted merely as conditional payment; that upon the dishonor of these notes the lien of their judgment might be enforced, or their debt be made available out of the "Montevideo" estate? If such was their understanding, it is remarkable that they consented to accept six thousand dollars in payment of a debt of eighteen thousand dollars well secured upon real estate.

Mr. Harveys was asked the question, why Merrick & Sons agreed to accept forty *per cent.* in satisfaction of their claim His answer is : The conclusion I came to was that Merrick & Sons did not have a very high opinion of Harveys & Williams' responsibility, or they would not have accepted that sum. This explanation is entirely satisfactory upon the supposition that the endorsement of Harveys & Williams was the only security of Merrick & Sons, but it is utterly inconsistent with the idea of the continued existence of the judgment and of the original debt. It is difficult to believe that Merrick & Sons were not accurately advised by their counsel in Virginia of the precise condition of their claim and the securities for its payment.

Mr. Williams, in his deposition, states that Merrick & Sons professed themselves willing to receive from Morriss' estate the same *per cent.* that other creditors got, upon receiving from Harveys & Williams an additional ten *per cent.* for their endorsement. They were, therefore, relying upon the endorsement of Harveys & Williams, and not upon the lien of the judgment or the continued existence of the antecedent indebtedness.

If any presumptions are to be derived from the conduct of men, we may justly infer from the conduct of Merrick & Sons what was their understanding of the operation and effect of the settlement of June 5th, 1869. Much reliance is placed upon the fact that the other creditors, the general creditors as they are termed, would not consent that Merrick & Sons should share in the general assets of Morriss' estate, because the debt bound the "Montevideo" property. The answer to this is obvious. It does not appear that these creditors knew, or ever had heard of, the settlement of the 5th of June, 1869. Indeed, it is very certain they were entirely ignorant of its existence, and they could therefore know nothing of the extinction of the original indebtedness by the substitution of the new securities.

The question, however, is not what they may have thought, but the light in which the parties to the transaction regarded it.

The next matter to be considered is, what was the understanding of Harveys & Williams. This inquiry is not at all essential to a just conclusion, for they as purchasers and assignees of the debt, can occupy no higher ground than Merrick & Sons, and if the latter are bound by the settlement of June, 1869, Harveys & Williams are estopped to controvert it. Still it will tend to elucidate the merits of the case, to ascertain their view of the transaction at the time.

In the original bill filed by Harveys & Williams for the purpose of subjecting "Montevideo" to the payment of this debt, no reference is made to the judgment now claimed as a lien on that estate. The claim there asserted is founded upon the negotiable notes of March 1st, 1870, executed by Charles Y. Morriss, which are averred to be an extension of an old debt Morriss owed Merrick & Sons many years previous. No one reading the bill would even conjecture there had been a judgment against Morriss in favor of Merrick & Sons, or that the latter had once held negotiable notes of the former, upon which a judgment was rendered. In the agreement of the 11th of June, 1870, signed by Morriss and wife, which was prepared by Mr. Williams, the same silence is preserved with respect to the judgment and the settlement. Nor is the slightest allusion made to them in the depositions of Harvey or Williams. This studious avoidance of all mention of that judgment and settlement is calculated to excite some suspicion that the parties were apprehensive of the effect of the settlement, if known, upon their present pretension. When the paper of the 11th of June, 1870, was prepared, it is difficult to believe the judgment and settlement had been entirely forgotten, and yet the only reference there made is to a certain debt con-

tracted by C. Y. Morriss to Merrick & Sons prior to the war.
But for the fact that Robert Morriss, one of the beneficia-
ries under the deed for "Montevideo," after his arrival at
age, brought the settlement of the 5th of June, 1869, to the
notice of the court, it is possible this cause would have
been decided without reference to that settlement, and in
entire ignorance of its existence. But whilst the judgment
is ignored for the reason that a claim under it would have
disclosed the settlement, an attempt is made to revive the
debt upon which the judgment was founded in order to
create a *quasi* lien upon the "Montevideo estate." I think
this record plainly shows that this idea was first conceived
when Charles Y. Morriss was in failing circumstances, and
Harveys & Williams conceived themselves endangered by
his insolvency. If the "Montevideo" estate could be held
liable for the Merrick debt, Harveys & Williams could the
more readily comply with the demands of the other cred-
itors of Charles Y. Morriss. These creditors claimed that
Morriss had given an undue preference to Harveys & Wil-
liams in paying the debts for which Harveys & Williams
were bound as endorsers. They insisted that this was an
act of bankruptcy, and they threatened proceedings against
Harveys & Williams to compel a *pro rata* restitution of the
amounts so improperly paid. So great was their appre-
hension of the result of these proceedings, they (Harveys
& Williams) offered to pay the sum of ten thousand dollars
by way of compromise. This offer was declined, and the
matter finally adjusted by the execution of the deed of
trust of 10th of June, 1870, in which Harveys & Williams
undertook to administer the assets of Charles Y. Morriss
without compensation, and to guarantee the payment of
thirty *per cent.* of his indebtedness to the creditors in ques-
tion. During the negotiations which led to the execution
of the deed of trust, Harveys & Williams had effected the
compromise with Merrick & Sons by paying them the sum

of $6,346.85 in full of their demands. This payment was made on the 6th of June, 1870. On that day Harveys & Williams had in their possession in round numbers the sum of $15,000 belonging to Charles Y. Morriss, $5,000 of which was deposited by Morriss on the day the payment was made to Merrick & Sons. It is claimed by Harveys & Williams, however, that the payment to Merrick & Sons was made with their own funds, and not with those deposited by Morriss, and that the arrangement with Merrick & Sons was not intended as a discharge of the debt, but a purchase by them from Merrick & Sons for their own benefit. I am not disposed to question the integrity or veracity of Harveys & Williams, or to impute to them anything inconsistent with good faith and fair dealing. They are no doubt honorable men, justly entitled to the reputation they sustain in the community. With the evidence in this record, and especially the admission of Charles Y. Morriss, it is probable, if the point was necessary to be decided, I should arrive at the same conclusion reached by Judge Fitzhugh upon this branch of the case. I have not the shadow of doubt, however, that the money used in paying Merrick & Sons was the money deposited by Charles Y. Morriss, although it may have been passed to the credit of the trust fund. Mr. Harvey so admits in his first deposition in the most unqualified manner, and C. Y. Morriss is equally explicit on the subject.

It is, however, not at all material to inquire in this connection how the fact really was. The execution of the deed of trust of the 10th of June, 1870, was a measure designed more for the relief of Harveys & Williams than for Charles Y. Morriss, who was hopelessly insolvent. Their plan then, or shortly before conceived, was to use the assets of Charles Y. Morriss in compromising with his creditors, to make sales of property to such of them as would not consent to an adjustment of their claims, to take a transfer

of the Merrick debt to themselves, to obtain from Charles Y. Morriss and Mrs. Morriss an acknowledgment that the "Montevideo" property was bound for its payment, and an agreement that they would throw no obstacles in the way of a recovery. Charles Y. Morriss, although at the time hopelessly insolvent, no doubt honestly believed that his assets would more than pay forty per cent. of his indebtedness, and that the effect of the deed of trust would be the restoration of his credit. I have no doubt these considerations constituted the main inducement, on his part, to the execution of the agreement of the 11th of June, 1870. It is worthy of observation, that Harveys & Williams neither delivered the deed of trust for recordation, nor did they execute the negotiable notes provided for in that deed until after Morriss and wife had signed the paper of the 11th of June, 1870. With the exception of the statements contained in that paper, I cannot see, as claimed by the learned chancellor, any evidence in the record, that all parties concerned seem to have treated the transaction as the continuation of the old debt in a new form. In neither of the depositions of Harveys & Williams, taken on two occasions, can there be found an allusion or statement to the effect that either of them at the time considered the new notes as a mere conditional payment, or that either believed the "Montevideo" estate still liable upon the antecedent indebtedness. Their silence on this subject is both significant and remarkable, because one of them certainly, if not both, was familiar with all the facts and circumstances attending the settlement of June 5th, 1869.

Much reliance is placed on the fact, that Harveys & Williams required Charles Y. Morriss to pay all the debts for which they were bound as endorsers, except the Merrick debt, and this exception, it is argued, must have grown out of the fact, that they regarded the Merrick debt as amply secured by reason of its lien upon the "Montevideo" estate.

Harveys & Williams do not say that this was the consideration which influenced them in dealing with the Merrick debt. A large part of that debt, much the larger part, was not due at the time of the inception and consummation of these proceedings in 1870. Neither Merrick & Sons nor Harveys & Williams could have required its payment. Their object was not to enforce or to make payment of the Merrick debt, but to compromise it on the same terms granted by the other creditors. That object would have been defeated by any arrangement looking to a payment in full of the amount due Merrick & Sons. The result showed the wisdom of the course pursued, for the debt was compromised on the most satisfactory terms.

I think, then, it has been conclusively shown that neither Merrick & Sons, at any time, nor Harveys & Williams, on any occasion prior to the anticipated insolvency of C. Y. Morriss, "treated the transaction as the continuation of the old debt in a new form." The agreement of the 11th of June, 1870, was an after-thought, growing out of the complications in which Harveys & Williams were involved with the creditors of C. Y. Morriss. So far as Charles Y. Morriss was concerned, he, no doubt, would have signed any paper they (Harveys & Williams) might have asked him to sign. His admissions or statements, as set forth in the paper of the 11th of June, 1870, are, of course, evidence against himself, but as against his wife and children, the beneficiaries under the deed of the 15th March, 1869, they are of no value whatever. They cannot be considered by this or by any other court.

With respect to Mrs. Morriss, no one can for a moment believe she would ever have signed that paper, had she been apprised of the settlement of the 5th of June, 1869, its legal effect and operation. But whether she did or did not understand it, she could not, in that form, bind herself or her estate; nor could she bind her children in any form,

by any contract or promise of indemnity, or any agreement to forbear the assertion of her rights, or indeed by any of the terms and stipulations therein contained.

The whole writing is an absolute nullity as to her and her children, and the cause must be decided precisely as though it had never been executed.

Without further protracting the discussion, I think, for the reasons stated, that the decree of the chancery court is erroneous in the particulars already alluded to, and must, therefore, to that extent be reversed and annuled.

It remains now to inquire whether Charles Y. Morriss is personally liable to Harveys & Williams for the Merrick debt. When this branch of the case was under argument in this court, it was asserted that the judge of the chancery court had not decided the question of such liability, but left it open for future consideration.

The correctness of this assertion was not controverted by the counsel on the other side, and some of the judges certainly, if not all of them, took it for granted that the fact was as stated.

Upon a careful examination of the record, I think the chancellor has passed upon the question, and has affirmed that such liability exists, and although the decrees entered by him may not be enforceable by execution, as they now stand they affirm a right of recovery on the part of Harveys & Williams to the extent of the amount paid by them to Merrick & Sons.

The question is, therefore, before us, and must be decided by this court.

The counsel for Charles Y. Morriss bases his alleged exemption from all liability for any part of that debt upon the provisions of the deed of 10th of June, 1870. I do not think this claim is well founded. The meaning of the deed, as I understand it, is that Charles Y. Morriss was to be released from all liability to his creditors included in

schedule (A) upon the execution and delivery to them of the three and six months' notes by Harveys & Williams.

These creditors were to look to Harveys & Williams for payment, and not to Charles Y. Morriss. But, if from any unforeseen cause, the assets conveyed by the deed proved insufficient to repay Harveys & Williams the amounts paid by them upon the three and six months' notes, then they were to be indemnified by Charles Y. Morriss. It is very clear that the Merrick debt which belonged to schedule B was not intended to be included in any part of this arrangement. That debt had been, prior to the deed of 10th of June, compromised with Merrick & Sons and transferred by them to Harveys & Williams. They were then the creditors really, and not Merrick & Sons. Although Harveys & Williams may have used the money of Charles Y. Morriss in making the purchase of the Merrick debt, they had charged themselves with all the funds of Charles Y. Morris in their hands and accounted for the same.

It is scarcely to be supposed that Harveys & Williams would agree to place the Merrick debt in the second class, release Charles Y. Morriss from all liability therefor, and at the same time fail to require of him the indemnity exacted from the other creditors who were in the preferred class. It is, however, unnecessary to discuss the provisions of the deed of 10th of June, 1870. We are saved all trouble on that point by the agreement of the 11th of June, 1870, known as paper K. This agreement recites that Harveys & Williams are endorsers of certain notes executed by Morriss to Merrick & Sons in extension and renewal of a debt contracted prior to the war; that Harveys & Williams had purchased these notes for the sum of $6,346.85, and that Charles Y. Morriss, by his deed of 10th June, 1870, had provided for the repayment of this sum to Harveys & Williams, but as the property therein conveyed might not be sufficient for that purpose, it was therefore agreed that

Morriss and his wife will not throw any impediment in the way of Harveys & Williams being reimbursed the amount so paid by them out of the "Montevideo" estate, but will instruct and direct their counsel to allow a decree to be entered for the sale of said estate as far as might be necessary. Now, it is difficult to conceive of a stronger admission of liability than is here expressed. If, by the provisions of the deed of the 10th of June, Charles Y. Morriss was relieved of all responsibility for the Merrick debt, is it conceivable that on the very next day he would have signed an instrument agreeing that an estate settled upon his wife and children should be taken for its payment and that a decree should be entered to that effect? Whatever may have been the motives operating upon him to execute this paper, it was his free and voluntary act. It is the acknowledgment and agreement of a person competent to transact business and to bind himself by the most solemn admissions and engagements. And although, as already said, neither the recitals nor the stipulations contained in this instrument bind Mrs. Morriss or her children, yet they are evidence against Charles Y. Morriss, and are conclusive evidence, standing, as they do, uncontroverted and unexplained. I think, therefore, the chancellor was right in tho opinion and the decree pronounced by him, so far as he affirms the liability of Charles Y. Morriss for this debt. If the appellees desire a personal decree against him, I think they are entitled to it. But I think it best to remand the case to the chancery court, that such decree may be entered there if it is desired by the parties concerned.

CHRISTIAN, ANDERSON, and BURKS, J's, concurred in the opinion of *Staples*, J.

DECREES REVERSED AND CAUSE REMANDED.