HOFFMAN *et al. v.* KNOX *et al.*

(*Circuit Court of Appeals, Fourth Circuit.* May 24, 1892.)

No. 3.

1. REHEARING—FINAL DECREE.

A decree fixing the priority of claims against an insolvent corporation, and directing the sale of its property for their payment, is a final decree, within equity rule 88, relating to rehearings.

2. BILL OF REVIEW—APPARENT ERROR.

Where a decree fixes the priority of claims against an insolvent corporation under the authority of an act of the state legislature, the question of the validity of the act not being raised at the time, a bill of review will not lie for apparent error, because the act is subsequently adjudged unconstitutional and void by the state courts on the ground of a defective title.

3. SAME—PERFORMANCE OF DECREE—DELAY.

In proceedings against an insolvent corporation claims for supplies were adjudged prior to the lien of mortgage bondholders under authority of an act of the state legislation, (as to the validity of which no question was raised,) and its property was directed to be sold. One of the bondholders became the purchaser, the others giving a bond as security for the deferred payments. Eighteen months thereafter the state court declared the act unconstitutional and void because of a defective title; whereupon the mortgage bondholders filed a petition for rehearing, (which was treated as a bill for review,) praying a vacation of so much of the decree as awarded priority to the supply claims. *Held*, it not appearing that complainants had performed the decree as to deferred payments, nor offered to place the supply claim creditors in the same position as before the decree was entered, and owing to the lapse of time, the petition should have been dismissed.

*Knox v. Iron Co.*, 42 Fed. Rep. 378, reversed.

Appeal from the Circuit Court of the United States for the Western District of Virginia. Reversed.

Statement by FULLER, Circuit Justice:

This was a bill filed by Samuel Knox against the Columbia Liberty Iron Company, alleging that the company had purchased a large tract of iron ore and woodland for the expressed consideration of $270,000, which was paid in its stock and in 6 per cent. first mortgage bonds to the amount of $150,000, the total issue of which was for $219,000, the balance having been pledged as collateral security, and in 6 per cent. second mortgage bonds to the amount of $145,000; that the mortgages bore the same date, and were secured upon the tract of land, and all the property of the company of every description, and its corporate franchises. It was further averred that complainant was the holder of certain of said mortgage bonds of both issues; that default had been made in the payment of interest after demand; that complainant had made various loans to the company, which it had failed and was unable to pay, and that there were other liabilities represented by promissory notes, open accounts for merchandise and supplies, and for wages and salary; that the company was insolvent, and had not the funds to carry on its ordinary business, although a large income could be derived therefrom, and to avoid the sacrifice of the property, and the disastrous consequences of suspending its business, it was necessary that a court of equity should interpose for the immediate appointment of a receiver, with power to administer the company's affairs. The bill prayed for such appointment, for injunction, and general relief. The company filed its answer, in which it "admitted the truth of the averments, and

submitted its interests to the court;" and the court appointed two receivers for the company, with authority to continue its operations, and with instructions to report to the court the condition and circumstances of the company, and its liabilities and debts.

On September 30, 1886, several creditors of the company filed a petition in the cause by leave of court, on behalf of themselves and other similarly situated, setting up certain supply claims recorded by them under the act of the general assembly of Virginia of April 2, 1879, averring that receivers' certificates had been issued; that there were many other like claims; that the affairs of the company were not improving; and praying that the proper accounts might be taken, and a decree for the sale of the property be granted. On October 14, 1886, the cause was referred to a special master to ascertain and report the debts outstanding against the company, not including the first and second mortgage bonds, and the priorities of the debts, if any. On the 4th of February, 1887, a petition was filed on behalf of one Pollard and all other creditors of the company who might avail themselves of the benefit of the same, praying for the removal of the two receivers, and the appointment of a single receiver. This petition (and rule thereon rendered) was answered by both of the receivers, one of whom stated "that he accepted the position of receiver of said company only at the request of Mrs. Mary W. Pearson, George W. Pearson, and Chas. L. Pearson, of Trenton, N. J., the largest holders of the capital stock of said company, and who now own or control a majority of both the first and second mortgage bonds, and of the complainant Samuel Knox, the petitioner Pollard, and Jacob Wissler;" and expressing entire willingness to relinquish the trust. On the 17th of February, 1887, Mary W. Pearson, Charles L. Pearson, and George W. Pearson, of New Jersey, filed their petition in the cause, by leave of court, setting forth their ownership of 1,885 shares of the capital stock of the iron company; and also that they were holders of 107 of the first mortgage bonds of the company in their own names, and others as collateral; and also of 112 of the second mortgage bonds; and stating that they were not satisfied with the present management of the receivers; that one of said receivers was named at the instance and request of said petitioners and others, and still had their entire confidence, but that a disagreement between the two militated against the proper management of the trust; and they requested the appointment of one Wissler as sole receiver. Thereupon the receivers were removed, though not upon any ground reflecting upon them personally, and Wissler appointed.

On February 14, 1887, the report of the master was filed, setting forth the outstanding indebtedness, not including the first and second mortgage bonds, and awarding priority to the labor and supply claims as stated therein. To this report exceptions were filed on behalf of a large number of claimants and creditors, and among others, on the 14th of March, 1887, exceptions by Mary W. Pearson, Charles L. Pearson, George W. Pearson, and H. H. Yard, creditors and bondholders of the company, their 1st, 2d, and 3d exceptions being:

"So far as it reports 'all labor claims open on the books of said company up to June 10, 1886, and closed on that day per the several statements filed by the claimants or their assignees. Said claims fell due on said June 10, 1886, and if even not recorded on the 14th of October, 1886, should be reported as subsisting liens, in the intent and meaning of the statute, and must be reported with priority as of that date with the common class, with all that stood unrecorded on that day, even should any of them have been recorded afterwards.' (2) Because he reports the words 'office agent,' used in the statute, as applying to the position of treasurer of said Columbia Liberty Iron Company. (3) As improperly construing the words 'conductors' and 'captains,' as applying to the position of managers."

Several other exceptions questioned the allowance of particular items as liens, or in respect of priority or of amount. The report was recommitted, with instructions to consider any testimony upon the various exceptions, and another report was made on May 11, 1887, to which exceptions were filed. The report and exceptions related particularly to the construction of the statutes of Virginia in relation to labor and supply claims, and as to whether claimants were barred under that statute, and generally to the classification of claims. The report was again recommitted, and on June 17, 1887, the court by decretal order of that date directed the master to make, state, and settle the following accounts: (1) An account of the indebtedness of the company due by mortgage or deed of trust upon its property, and by whom and in what proportions held, and how evidenced, and the priorities or equities among the several holders or claimants thereof. (2) An account of other indebtedness of the company, together with any priorities by way of lien or otherwise; and in this connection stating specially any lien of any sort that might subsist against any part of the company's property, so stated that there might appear a full and correct account of the company's indebtedness, and with the respective priorities of the same, with a view to a sale of the property. (3) An account of the property, real and personal, of the company. (4) Any other account which any party in interest may require or the commissioner may deem of importance.

On August 31st, a partial report of the special master was made. This was followed by a decree September 8, 1887, disposing of the various exceptions to the master's reports, overruling, among others, the first exception of Mary W. Pearson and others, and sustaining exceptions to particular items. It was decreed, among other things, that all claims for labor and supplies that had not matured more than six months before the order of reference, October 14, 1886, or, having matured more than six months prior thereto, had been recorded, should be liens upon the property and franchises of the company superior to that of the bondholders of the company, and must be paid before said bonds; that all claims which had matured more than six months prior to October 14, 1886, and not recorded as required by the statutes of Virginia, within six months after maturity, were not liens on the company's property, and were subordinate to the bondholders; that, as between claims for labor and supplies furnished said company, the labor claims were prior, and must be paid first; and that the president, treasurer, secretary, and

manager were not entitled to priority, but must be treated as general creditors. It was further ordered and decreed that the special master proceed and complete his accounts as directed by the decretal order of June 17, 1887, stating therein all liens upon the property of the company in the order of their priority, in accordance with the opinion of the court expressed in the decree. The disposition of one claim was reserved for further consideration on the master's report.

On September 24, 1887, a report was made by the master, stating the accounts specifically as directed. Exceptions were filed to this report by Mary W. Pearson and others in respect of two specified claims. On October 14, 1887, a decree was entered reciting that the cause came on to be heard upon the papers formerly read and proceedings theretofore had, the report of September 24th, etc., and overruling the exceptions to the report, which report was approved and confirmed, and special commissioners appointed (all parties in interest waiving delay for redemption) to make sale of the property in question, at public auction as prescribed, for one quarter cash on confirmation, and the balance in one, two, and three years, with interest from day of sale. The property was accordingly sold on January 5, 1888, to George W. Pearson, for $51,000, and by decree of May 26, 1888, the report of the sale, under the decree of October 14, 1887, was confirmed, there being no exceptions; a deed directed to be given; payment of the costs of suit and of sale out of the cash payment and distribution of the balance ordered; and settlement of the receiver's accounts. Provision was also made for the collection of the deferred payments, to be disbursed under future order of court.

May 8, 1889, Mary W. Pearson, George W. Pearson, and Charles L. Pearson, on behalf of themselves and all other holders of the first mortgage bonds of the company, applied to the court for leave to file a petition for rehearing or bill of review to review the decrees of September 8, 1887, and October 14, 1887, and on July 19, 1889, leave to do so was granted. The prayer of this petition or bill of review was that the decrees named should be reviewed, reversed, and set aside, so far as they established and adjudged the rights of other creditors of the company to be superior or equal to those of petitioners. The petition set forth the various orders, proceedings, and decrees heretofore referred to, and claimed that there were no superior equities in favor of the labor and supply claims entitling them to a lien superior to the mortgage bonds; that the acts of the legislature of Virginia, which it had been held created a prior lien in favor of these claims, were unconstitutional and void; that the petitioners were entitled to a vendor's lien upon the property; and that the special master erred in refusing to recognize this lien, and in giving the labor and supply claims superiority to the first mortgage bonds. To the filing of this petition or bill the labor and supply claimants objected, and after it had been filed, by leave of court, demurred, assigning as grounds that the petitioners had no vendor's lien; that the acts of the Virginia legislature referred to were not unconstitutional and void; and that the petition did not allege that the matters

therein set up had been discovered after the rendition of the decrees complained of, and could not have been produced by the use of due diligence before. They also filed an answer in which they denied any error in the decrees, the existence of any vendor's lien, and the unconstitutionality of the legislative acts; and contended as to the latter that, if a defect existed, it had been cured by section 2485 of the Virginia Code of 1887. They also insisted that their equities were superior to those of the bondholders, and that the latter were estopped by the decrees, and their own acquiescence in them, or by lapse of time. The answer further claimed that the capital stock of the company had never been paid in, and constituted a fund for the payment of debts. December 19, 1889, the court rendered a decree, which sustained the first ground of demurrer, that as to the vendor's lien, and overruled the others, and reheard and set aside the decrees in question, and referred the cause to a special master, who reported, February 17, 1891, that only the mortgage bonds which were held as collaterals for loans by the company ought to be held to have been negotiated, and to constitute valid liens under the mortgages; that the bonds apportioned among themselves by the original corporators of the company could not, as against the creditors of the company, be said to have been negotiated, and were not, therefore, liens; that the labor claims were prior liens upon the franchises and property of the company, and that the supply claims were also such prior liens; that, if this were not so, the sale should be set aside, and such creditors permitted to bid; and that there were unpaid subscriptions to the amount of $218,625, which he was of opinion was a trust fund for the payment of debts, and should be collected from the delinquent subscribers. Various exceptions were filed by the parties in interest. On July 1, 1891, the court entered a decree that the labor and supply claims had no priority, and that the capital stock of the company had been fully paid, and was not liable to assessment for the payment of debts, and directing payment in the order therein stated. From these decrees the labor and supply creditors were allowed an appeal.

*John E. Roller*, for appellants.

*Geo. E. Sipe* and *John T. Harris, Jr.*, for appellees.

*Ed. S. Conrad*, for Mary W. Pearson and other petitioners.

Before FULLER, Circuit Justice, BOND, Circuit Judge, and HUGHES, District Judge.

FULLER, Circuit Justice, after stating the facts, delivered the opinion of the court.

By the decrees of September 8 and October 14, 1887, all claims against the property in question, and the order of their priority, and the exceptions to the various reports, were disposed of, and the then final report of the master, as amended and reformed in accordance with the views of the court, was approved and confirmed, and thereupon commissioners were appointed to sell the entire property upon the terms of one fourth cash, and the balance payable in one, two, and three years, with

interest from the date of sale, with security. The sale thereupon took place and was confirmed May 26, 1887, and distribution made of the cash payment, and a final settlement with the receiver was directed. It seems to us that these decrees were and must be regarded as constituting a final decree in the case. We treat them together because the decree of September 8th, while it disposed of nearly all the claims and exceptions, reserved the determination of a specific claim or claims, which was arrived at by the adjudication of October 14th, and it was the latter, which, all these matters being concluded, decreed the sale. If an appeal had been taken by the present appellees to the supreme court of the United States, and the decree had been affirmed, the court below would have had nothing to do but to execute the decree which it had already entered. What remained to be done was merely in execution of what been determined, such as the collection of the outstanding payments, settling the receiver's accounts, payment of costs, and the like; and this is no less so because some other creditor might turn up, and seek to come in under the decree. The bringing of the fund into court was for the final distribution as decreed, and not to be held pending the ascertainment of the principles upon which it should be distributed. *Hill* v. *Railroad Co.*, 140 U. S. 52, 11 Sup. Ct. Rep. 690; *Bank* v. *Sheffey*, 140 U. S. 445, 11 Sup. Ct. Rep. 755. The petition for rehearing presented May 8, 1889, came too late. Equity rule 88. The circuit court held, however, that the petition could be treated as, and in fact was, a bill of review for errors apparent, and might be filed as such. Considered in this aspect, did the court err in the decree entered thereon December 19, 1889, reversing and setting aside the decrees of September 8 and October 14, 1887, "in so far as they gave priority to the claims of the supply and labor creditors of the said Columbia Liberty Iron Company as superior to the rights of the first mortgage bondholders?" This question is to be determined without resort to the proofs, upon the pleadings, proceedings, and decrees which in this country constitute the record proper.

Assuming that these were fully set forth in the bill, the demurrer raised the question. Being overruled, the decrees were reversed; if sustained, the bill would have been dismissed. Other matters are referred to, but they may be disregarded on this inquiry, and the bill taken as a pure bill of review for error apparent, thus stated by the circuit court, in its opinion, which will be found reported in 42 Fed. Rep. 378:

"In the master's reports, as confirmed, priority is given to certain labor and supply claims, contracted by the company before the appointment of the receivers, over the bonds secured by the mortgage. This priority was in accordance with the provisions of two acts of the general assembly of Virginia, approved, respectively, March 21, 1877, and April 2, 1879. Since the entry of the decrees of September 8 and October 14, 1887, in this cause, the Virginia statutes giving labor and supply claims a priority over the liens of the mortgage bondholders have, as to supply claims against railroad corporations, been declared by the court of appeals of Virginia to be unconstitutional, as in violation of article 5, § 15, of the constitution of Virginia. *Fidelity Ins., etc., Co.* v. *Shenandoah Val. R. Co.*, 86 Va. 1, 9 S. E. Rep. 759.

And this court has also, after full argument, in *Fidelity Ins., etc., Co.* v. *Shenandoah Iron Co.*, 42 Fed. Rep. 372, decided the act of April 2, 1879, to be unconstitutional as to both labor and supply claims against mining corporations.    It is in view of these decisions that these petitioners ask leave to file their petition to have this cause reheard, and the decrees of September 8 and October 14, 1887, reviewed and reversed.   *   *   *   But if it could be conceded that the decrees of September 8 and of October 14, 1887, are final decrees, the court is of opinion that the petition can be treated as, and in fact is, a bill of review for errors apparent on the face of the record, and might be filed as such.    The recent decisions referred to, as deciding that the statute giving labor and supply claims the priority over the lien of the mortgage bondholders is unconstitutional, clearly presents 'a question of error on the face of the record.   *   *   *' Since the rendition of the decrees complained of, the highest state court has declared the statute upon which the lien rests, or out of which it arises, to be invalid because unconstitutional, and federal courts will judicially notice and accept such decision."

To sustain a bill of review for error of law apparent, the decree complained of must be "contrary to some statutory enactment, or some principle or rule of law or equity recognized and acknowledged, or settled by decision, or be at variance with the forms and practice of the court."    2 Daniell, Ch. Pr. (5th Ed.) *1577.   · The general rule is that such a bill does not lie to correct a mere error, which would, in effect, render it nothing more than a substitute for an appeal.

In *Perry* v. *Phelips*, 17 Ves. *174, *177, Lord ELDON said:

"There is a great distinction between error in the decree and error apparent.    The latter description does not apply to merely erroneous judgments, and this is a point of essential importance; as, if I am to hear this case upon the ground that the judgment is wrong, and that there is no error apparent, the consequence is that in every instance a bill of review may be filed; and the question whether the case is well decided will be argued in that shape, not whether the decree is right or wrong on the face of it.    The cases of error apparent, found in the books, are of this sort, an 'infant not having a day to show cause, etc., not merely an erroneous judgment."

So, also, a decree against the statute law is the subject for a bill of review, as, for example, a decree directing a legacy to be distributed contrary to the statute of distributions.    Story, Eq. Pl. § 405.    So where a decree was entered for the sale of mortgaged premises, capable of division, to pay the whole mortgage debt, when only a small part of the debt was due.    *James* v. *Fisk*, 9 Smedes & M. 144.    And where a foreclosure decree was made contrary to the terms of the mortgage.    *Mickle* v. *Maxfield*, 42 Mich. 304, 3 N. W. Rep. 961.    These are manifest errors not open to controversy, and while the modern practice has tended to allow the court of first instance to review or reverse its own decrees, for an erroneous application of the law to the facts found, whenever an appellate tribunal would do so for the same cause, this has certainly not been carried so far as to ignore the rule in principle.    That principle is that the remedy for mere error in a final decree is by appeal, and that the error apparent for which such a decree may be impeached by bill of review must be more than the result of mistaken judgment.

The ground upon which the supreme court of appeals of Virginia proceeded, and the circuit court, following the rule laid down by that court,

in the cases referred to, was that the acts in question, so far as they related to supply creditors and to mining and manufacturing companies, were unconstitutional and void, as in violation of the provision of the state constitution that "no law shall embrace more than one subject, which shall be expressed in its title." Const. Va. art. 5, § 15. It is ordinarily held that, if the subject of an act be expressed in the title in general terms, it will be sufficient under constitutional provisions like that quoted. The determination of the question whether the title of a particular act is comprehensive enough to reasonably include the several objects which the statute assumes to affect is one of great delicacy, and upon which opinions might well differ; and a decree rendered upon one view or the other, while it might be reversed by the appellate court as erroneous, can hardly be said to carry that error upon its face which is required as the basis of a bill of review.

If the question of the validity of these laws was raised in this case before the rendition of the final decree, and the circuit court erroneously determined that they were not obnoxious to constitutional objection, the remedy for such error would have been by appeal, and we do not think that the circuit court, because after the lapse of the term it arrived at a different conclusion in another case, could properly entertain a bill of review to impeach such a decree. The presumption was in favor of the constitutionality of the statute and the burden of proof on the party setting up its unconstitutionality; and if the court, upon its attention being drawn to the subject, judicially recognized the acts as valid, that determined the question for the case, if permitted to remain undisturbed without invoking the interposition of an appellate tribunal. The fact that nearly 18 months after the decree of October 14, 1887, the court of appeals of Virginia decided these laws to be unconstitutional for the reason stated, was not enough in itself to create error of law apparent, and justify a bill of review on that ground or that of new matter *in pais.*

Undoubtedly, the courts of the United States, as a general rule, properly follow the construction placed upon the constitution or laws of a state by the decisions of its highest tribunal, unless they conflict with or impair the efficacy of some provision of the federal constitution or a federal statute or a rule of general commercial law, (*Gormley* v. *Clark,* 134 U. S. 328, 348, 10 Sup. Ct. Rep. 554;) but this rule cannot be applied where the construction contended for has not been announced at the time of the final adjudication by the United States court, so as to make the latter erroneous on its face by relation. On the other hand, we cannot find that these bondholders raised any question whatever as to the validity of these laws, but, on the contrary, the exceptions they filed were directed to throwing out particular claims as not within the terms of the statutes, or claims in whole or in part as barred thereunder. It is a general rule that a bill of review will not lie to impeach a consent decree. *Thompson* v. *Maxwell,* 95 U. S. 391. And if these complainants chose to acquiesce in the allowance of these claims under these statutes, they had a perfect right to do so, but ought not now to be allowed, in view of a decision rendered eighteen months after this decree, to say

that error was committed in particulars which they waived by their conduct. They could not approbate and reprobate at the same time, and, in the interest of the stability of judicial decision, their want of diligence ought to be held fatal to their application.

The last of these decrees was rendered October 14, 1887, and the sale of the property was made thereunder. The amount bid at the sale was $51,000, and no exceptions were taken, (presumably because that was sufficient to cover the preferential claims, or nearly so,) notwithstanding, as alleged, the property cost the ancestor of the Pearsons nearly $200,-000, and was sold to the company by them for some $219,000 first mortgage bonds, $101,000 second mortgage bonds, and stock of the company to the amount of $499,625, which bonds and stock the circuit court held were fully paid for by the property so sold. The purchase was made by one of the complainants in the bill of review, whose bonds for the deferred payments were secured by his cocomplainants as sureties. The relief sought was not the vacation of the decrees of September 8 and October 14, 1887, but only of so much thereof as awarded these priorities, and the application to file the bill was not made until the 8th of May, 1889, the decision of the court of appeals of Virginia having been announced on the 11th day of the preceding April. The decree rendered reviewed and reversed only so much of the prior decrees as gave priority to appellants' claims, and thereby the opportunity to bid, or get others to bid, at the sale of this valuable property, was cut off by the very decrees which were only reversed so far as their claims were concerned. It may be that such opportunity would have availed nothing, but that does not change the matter in principle. It is the rule, subject, however, to some exceptions, that, before a bill of review can be filed, the decree must be first obeyed and performed. Thus, if money is directed to be paid, it ought to be paid before the bill of review is filed, though it might afterwards be ordered to be refunded. *Ricker* v. *Powell*, 100 U. S. 104, 108.

It does not appear that these complainants had performed the previous decree when their bill of review was permitted to be filed. On the contrary, they objected that the second payment then due might be disbursed under the prior decree, and it would be impossible for them to recoup. Nor did they ask that the sale be set aside, nor in any manner offer to place these creditors in the same situation that they occupied before that decree was entered; but, after having proceeded upon the theory of the validity of these laws, they came forward with their bill of review to obtain a reversal of so much of the decrees as was opposed to their interests, leaving what was made in their favor to stand. We are of opinion that they were called upon to present their contention before, if they intended to insist upon it. Cases are not to be tried by piecemeal, and it would open a wide door to persistent litigation if parties should be permitted to lie back, and then renew controversies in this manner.

The decrees of the circuit court appealed from are reversed, and the cause remanded, with a direction to dismiss the petition for rehearing or

bill of review, and for further proceedings upon the basis of the finality of the decrees of September 8 and October 14, 1887, in conformity to this opinion.